## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORD CITY CONDOMINIUM ASSOCIATION, | ) | No. 21-B-05193 |
| | ) | |
| Debtor. | ) | Judge Carol A. Doyle |
| | ) | |

### NOTICE OF MOTION

To:     Any party that has requested notice pursuant to Bankruptcy Rule 2002

**PLEASE TAKE NOTICE** that on **Thursday, June 3, 2021** at 10:00 a.m. Central Time, we shall appear before the Honorable Carol A. Doyle, and present the *Motion for Adequate Assurance or, in the Alternative, Authorization to Terminate Utility Services*, a copy of which is attached.

**The motion will be presented and heard electronically using Zoom for Government**. No personal appearance in court is necessary or permitted.  To appear and be heard telephonically on the Motion, you must do the following:

**To appear by video**, use this link: https://www.zoomgov.com/.    Then enter the meeting ID and password.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252  or 1-646-828-7666.  Then enter the meeting ID and password.

**Meeting ID and password**.  The meeting ID for this hearing is **161 155 8289**, and the passcode is **Doyle742**.  The meeting ID and password can also be found on the Judge's page on the Court's website.

**If you object to the motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date.  If a Notice of Objection is timely filed, the motion will be called on the presentment date.  If no Notice of Objection is timely filed, the Court may grant the motion in advance without a hearing.

Dated: May 20, 2021

Respectfully submitted,

/s/ Peter A. Siddiqui

Peter A. Siddiqui (ARDC No. 6278445)
Ethan D. Trotz (ARDC No. 6330562)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 902-1061
peter.siddiqui@katten.com
ethan.trotz@katten.com

*Counsel for Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY THAT** on this day, the foregoing *Motion for Adequate Assurance or, in the Alternative, Authorization to Terminate Utility Services* was electronically filed with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on all parties via transmission of Notices of Electronic Filing generated by CM/ECF.

By:    /s/ Peter A. Siddiqui
        Peter A. Siddiqui

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORD CITY CONDOMINIUM ASSOCIATION, | ) | No. 21-B-05193 |
| | ) | |
| Debtor. | ) | Judge Carol A. Doyle |
| | ) | |

**MOTION FOR ADEQUATE ASSURANCE OR, IN THE ALTERNATIVE,**
**AUTHORIZATION TO TERMINATE UTILITY SERVICES**

Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC (collectively, "Movants"), by and through their undersigned counsel, file this motion (the "Motion") seeking adequate assurance or, in the alternative, authorization to terminate utility services, and respectfully states as follows:

**Relief Requested**

1. Ford City Condominium Association (the "Debtor") is the association for a condominium complex in Chicago, Illinois (the "Ford City Condominium"). Movants, as tenants-in-common, own and operate the Ford City Mall, which is a shopping center located on a parcel of land contiguous with the Ford City Condominium. Movants and the Debtor are parties to an agreement that, among other things, addresses the manner in which water is made available to the Ford City Condominium. In short, Movants obtain water from the City of Chicago on behalf of the Ford City Condominium, and then charge the Debtor the costs of such water. Neither the Debtor nor the Ford City Condominium have a direct hook up to the City of Chicago water system. The only way the Ford City Condominium and its residents get running water is through the agreement with Movants.

1

2.      The Debtor has not made timely and complete payments for water. The last payment the Movants received was on March 15, 2021, which was a partial payment made by the receiver (the "Receiver") appointed in certain state court litigation.[1] As of the Petition Date, the Debtor owed Movants approximately $1,507,308.26 for water.[2] Since the Petition Date, the Debtor has not made any payments to Movants for water used, though water has been continuously provided during this period.

3.      The Movants are seeking adequate assurance in the forms of (a) the payment of all postpetition amounts due for water and (b) a prepayment, deposit, or letter of credit equal to the value of one month of the cost of water, as calculated using the average monthly payment for the twelve-month period before the Petition Date, or in the alternative, authorization to terminate the provision of water.

## Jurisdiction and Venue

4.      The United States Bankruptcy Court for the Northern District of Illinois (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief sought herein is section 366 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]     The Receiver was appointed by court order entered on December 1, 2020, in *Ford City Realty LLC, et al. v. Ford City Condominium Association*, Case No. 2018-L-008190 (Cook County Circuit Court, Illinois). *See also* SOFA 7.2, Docket No. 1 at 35.

[2]     Movants purchased the real property on which the Ford City Condominium and Ford City Mall sit in April 2019. As part of that transaction, Movants assumed any balances the Debtor owed at the time of the acquisition on account of water services provided by Movants' predecessor-in-interest.

## Background

### A.    General Background

6.    On April 20, 2021 (the "Petition Date"), the Debtor filed a voluntary petition relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its business and manage its properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee has been appointed in this chapter 11 case.

7.    The Debtor is a not-for-profit condominium association located at 4300 West Ford City Drive, Chicago, Illinois on a contiguous parcel of real property with the Ford City Mall. The Debtor acts as the governing body regarding administration and operation for all condominium unit owners in the Ford City Condominium.

### B.    Utility Services

8.    Pursuant to a certain Agreement (the "Agreement", attached hereto as **Exhibit A**) executed in 1978 by the predecessor owners of the Ford City Mall and the Ford City Condominium, Movants purchase water from the City of Chicago and make available such water to the Ford City Condominium. The Debtor is then obligated to reimburse Movants for the costs of the portion of water provided to the Debtor.

9.    Debtor historically has struggled to make timely payments for water services. Payments for water services over the years have been irregular and insufficient. Movants or their predecessor-in-interest have been providing water services to the Ford City Condominium since December 7, 2012. In January 2016, after the Debtor accrued a significant arrearage on water services, the Debtor and Movants agreed to an installment payment plan. By November 2017, Debtor again fell behind on payments. On July 31, 2018, Movants' predecessor-in-interest

3

commenced litigation in the Circuit Court of Cook County, Illinois seeking a judgment on amounts paid (a copy of the amended complaint, without exhibits, is attached hereto as **Exhibit B**).

10.     As of the Petition Date, approximately $1,507,308.26 is due and owing under the Agreement, exclusive of amounts owed for water provided in April (during the period after the Petition Date) and May 2021.  The last payment the Movants received was on March 15, 2021, which was a partial payment made by the Receiver.  The Debtor has not proposed to Movants any form of adequate assurance.  Movants continue to incur costs daily for the provision of water to the Ford City Condominium.

11.     The Movants seek adequate assurance in the forms of (a) the payment of all postpetition amounts due for water and (b) a prepayment, deposit, or letter of credit equal to the value of one month of the cost of water, as calculated using the average monthly payment for the twelve-month period before the Petition Date, or in the alternative, authorization to terminate water services.

### Basis for Relief

**A.     Legal Standard Under 11 U.S.C. § 366**

12.     Section 366 of the Bankruptcy Code prohibits a "utility" from immediately terminating or altering utility services for a period immediately following the Petition Date. *See* 11 U.S.C. § 366(a).  Although "utility" is not defined in the Bankruptcy Code, the legislative history of section 366 states that the provision is "intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility." *In re Darby*, 470 F.3d 573, 575 (5th Cir. 2006) (quoting legislative history, and finding that a cable television service provider was not a utility for purposes of section 366

because cable television is "not necessary to a minimum standard of living" and would not be a "crippling inconvenience in obtaining alternative service."); *see also In re One Stop Realtour Place, Inc.*, 268 B.R. 430 (Bankr. E.D. Pa. 2001) (phone services were essential such that the provider was a utility because debtor was likely to lose her business if the phone company ceased service). Other courts look to whether the utility has some sort of special relationship with the debtor.

13.    Section 366(c) requires the debtor to provide adequate assurance of payment for postpetition services in a form satisfactory to the utility provider within thirty days of the Petition Date, or the utility provider may alter, refuse, or discontinue service. 11 U.S.C. § 366(c)(2). Section 366(c)(1) enumerates what constitutes assurance of payment, which can include a cash deposit, a letter of credit, a certificate of deposit, a surety bond, a prepayment of utility consumption, or another form of security that is mutually agreed on between the utility and debtor. *Id.* § 366(c)(1).

14.    When considering whether a given assurance of payment is adequate, court examine the totality of the circumstances to make an informed decision as to whether the utility will be subject to an unreasonable risk of nonpayment. *See Mass. Elec. Co. Keydata Corp. (In re Keydata Corp.)*, 12 B.R. 156, 158 (B.A.P. 1st Cir. 1981) (citing *In re Cunha*, 1 B.R. 330 (Bankr. E.D. Va. 1979)); *In re Marion Steel Co.*, 35 B.R. 188, 198 (Bankr. N.D. Ohio 1983) ("The utility must be protected from an unreasonable risk of nonpayment."); *see also In re Penn. Cent. Transp. Co.*, 467 F.2d 100, 103-04 (3d Cir. 1972) (affirming bankruptcy court's ruling that no utility deposits were necessary where such deposits likely would "jeopardize the continuing operation of the [debtor] merely to give further security to suppliers who already are reasonably protected").

Courts are not bound by state or local regulations that set adequate assurance of payment postpetition. *In re Begley*, 41 B.R. 402, 405-06 (Bankr. D. Pa. 1984).

15.      Further, the Court possesses the power, under section 105(a) of the Bankruptcy Code, to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

16.      Here, the Movants are entitled to adequate assurance under the plain language of section 366 of the Bankruptcy Code. Ford City Mall is a utility.  Water is necessary to a minimum standard of living, and Ford City Mall occupies a special relationship with the Debtor relative to other creditors. The Ford City Condominium does not tie in directly to the City of Chicago's water system and has no way to procure water other than through the Agreement with Movants.

17.      Movants face an unreasonable risk of nonpayment and are not otherwise already protected of that risk.  The Debtor has historically and consistently struggled to make timely and sufficient payments for water services.  The Movants are currently owed approximately $1,507,308.26 on account of water services provided, and have not received a payment since March 15, 2021, which was only a partial payment made by the Receiver. The arrearage is growing by the day, and the Debtors continues to accrue amounts owed for water services provided after the Petition Date. All the while, the Debtor has failed to propose any form of adequate assurance or even approach the Movants regarding adequate assurance.

18.      The Movants respectfully request adequate assurance in the forms of (a) the payment of all postpetition amounts due for water and (b) a prepayment, deposit, or letter of credit equal to the value of one month of the cost of water services, as calculated using the average monthly payment for the twelve-month period before the Petition Date, or in the alternative, authorization to terminate water services.

## Waiver of Stay Under Bankruptcy Rule 6004(h)

19.     Movants also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

## No Prior Request

20.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC respectfully request that the Court grant the Motion and grant such other and further relief as the Court deems just and proper.

Dated: May 20, 2021

Respectfully submitted,

*/s/ Peter A. Siddiqui*

Peter A. Siddiqui (ARDC No. 6278445)
Ethan D. Trotz (ARDC No. 6330562)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 902-1061
peter.siddiqui@katten.com
ethan.trotz@katten.com

*Counsel for Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC*

## Exhibit A

FILED DATE: 8/20/2019 12:11 PM   2018L008190

24 748 418

③   66-45-554C                    $15.00

## AGREEMENT

THIS AGREEMENT, made and entered into this 21st day of November, 1978, by and between THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, a New York corporation, hereinafter referred to as "Equitable", and AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association, not personally, but as trustee under a trust agreement dated October 10, 1978 and known as Trust Number 45050, hereinafter referred to as "Trustee".

## WITNESSETH:

A. Equitable is the owner in fee simple of a tract of real property located in the City of Chicago, County of Cook, State of Illinois, known as the Ford City Complex, such real property being legally described in Exhibit A attached hereto and herein referred to as "the Equitable Real Estate".

B. Equitable, as the owner of the Equitable Real Estate, also owns easement rights for the benefit of the Equitable Real Estate over other real property adjoining the Equitable Real Estate, created as follows (collectively "the Easements"):

1. Easements for ingress and egress and sewer easement created by Reciprocal Grant of Roadway Easement Rights, Sewer Easement and Maintenance Agreement dated January 5, 1976 between Equitable and Board of Junior College, District Number 508, County of Cook and State of Illinois recorded January 8, 1976 as Document No. 23369893;

2. Reservation contained in warranty deed from Chicago Industrial District, Inc. ("CID") to Sweetheart Cup Corporation ("Sweetheart"), recorded October 18, 1966

This instrument prepared by:

James A. Winkler, Esq.
Wilson & McIlvaine
135 S. LaSalle St., Suite 2300
Chicago, Illinois  60603

CHICAGO TITLE AND TRUST COMPANY
111 WEST WASHINGTON
CHICAGO, ILLINOIS  60602
ATTN:

Box 50

FILED DATE: 8/20/2019 12:11 PM   2018L008190

as Document No. 19972007 of an easement to use and
operate water mains, steam pipes and fire mains and
hydrants and rights of entry contained therein;

3.   Easement for water contained in that certain
Easement for Water dated __August 2, 1978__ and
recorded _November 22_, 1978 as Document No.
_24733331_ between Equitable and Sweetheart.
[Blanks to be filled in at closing]

The Equitable Real Estate and the real estate covered by the
Easements are sometimes referred to collectively as "Parcel I".
The Easements referred to in Subsections 2 and 3 above are
sometimes hereinafter referred to collectively as "the Sweetheart
Easements".

C.   Equitable has, as of the date hereof, sold to Trustee
a tract of land, with buildings and improvements located thereon,
adjoining and contiguous to the Equitable Real Estate and
legally described in Exhibit B attached hereto and herein
referred to as "Parcel II". Said sale has been made pursuant
to a Real Estate Sale Contract ("the Contract") dated October
10, 1978 between Equitable and Trustee.

D.   There are located on Parcels I and II certain private
roadways shown and described on the plat attached hereto as
Exhibit C and hereinafter referred to as "the Private Roadway
System". Pursuant to the Contract, Equitable and Trustee have
agreed to grant to each other cross-easements for the use of
the Private Roadway System.

E.   There are located on Parcels I and II certain storm
and sanitary sewer mains ("the Sewer System") which service
both Parcel II and parts of Parcel I. Such mains are located
within a 30-foot wide strip legally described in Exhibit D ("the
Sewer Easement Area"). Pursuant to the Contract, Equitable and

-2-

Trustee have agreed to grant to each other cross-easements for
the use of the Sewer System located within the Sewer Easement
Area.

F.  That portion of Parcel I outlined in red on Exhibit E
attached hereto and labelled "Office Building Site" includes
approximately 45 spaces for the parking of motor vehicles.
The Office Building Site is legally described in Exhibit F.
Parking areas on the Office Building Site are hereinafter
referred to as "Office Parking Spaces".  That portion of Parcel
II outlined in green on the attached Exhibit E (hereinafter
referred to as "Apartment Parking Spaces") contains approximately
73 spaces for the parking of motor vehicles.  Pursuant to the
Contract, the parties have agreed to grant mutual cross-easements
for the use of such respective parking areas.

G.  There are located on Parcel I and on other property
certain mains supplying the domestic water system and the fire
protection system for Parcel II.  The mains located in Parcel II
are connected to mains located within a 10-foot wide strip
located within the Sweetheart Easements, which 10-foot wide
strip is located on the real estate legally described in Exhibit
G ("Sweetheart Property") in the area marked in red on the plat
annexed hereto as Exhibit G-1 ("Water Easement Area").  The
parties desire hereby to provide for the continuing use of such
mains by Trustee as the owner of Parcel II, and for the purchase
by Trustee of water therefor from Equitable.

H.  The parties hereto agree that the state of maintenance
and repair from time to time of Parcel II and Parcel I may have
an impact on the operation and value of Parcel I and Parcel II,
respectively.  The parties desire hereby to provide for the
continued state of maintenance of Parcels I and II at such
standard as will not detract from the operation and value of
the other parcel.

-3-

FILED DATE: 8/20/2019 12:11 PM  2018L008190

NOW, THEREFORE, in consideration of the above-stated
premises and the mutual terms, covenants and agreements herein
contained, and to fulfill the mutual obligations stated in the
Contract, the parties hereby agree that:

### Article I
### Definition of "Grant"

Wherever in this Agreement Equitable has granted or
conveyed to Trustee an easement or other right over any portion
of Parcel I which is not part of the Equitable Real Estate
but rather is property in which Equitable has easement rights
as set forth above, the grant or conveyance by Equitable herein
contained shall be construed as a non-exclusive assignment by
Equitable to the Trustee of its rights under said Easement;
subject however to Equitable's continuing right to use and enjoy
the said easement on a non-exclusive basis and to further assign
such easement rights on a non-exclusive basis to other purchasers
of all or parts of the Equitable Real Estate from time to time.

### Article II
### Reciprocal Grant of Easements Over the Private Roads

1. Equitable does hereby grant unto Trustee, its successors
and assigns, for the benefit of Parcel II and the owners, users
and occupiers from time to time thereof, a perpetual and non-
exclusive easement for ingress and egress for pedestrian and
vehicular traffic, including trucks, to and from South Cicero
Avenue and South Pulaski Road over and upon the Private Roadway
System.

2. Equitable hereby reserves the right to grant further
easements over the Private Roadway System, including that portion
thereof lying within Parcel II, for ingress and egress to other
owners of land forming a part of Parcel I, which easements for
ingress and egress will similarly be non-exclusive and substantially
similar in form and substance to the easements herein granted.

-4-

FILED DATE: 8/20/2019 12:11 PM   2018L008190

3.  Trustee does hereby grant, bargain, sell, convey and warrant unto Equitable, its successors and assigns, for the benefit of Parcel I and the owners, users and occupiers from time to time thereof, a perpetual and non-exclusive easement for ingress and egress for pedestrian and vehicular traffic, including trucks, over and upon that part of the Private Roadway System located within Parcel II.

4.  Equitable agrees that it will take all necessary steps to keep the asphalt-improved, all-weather roadway for motor vehicles open as a raod at all times over its entire length throughout the Private Roadway System, from Cicero Avenue to Pulaski Road, including that part of said system which lies in Parcel II, except during such times as repair may be made thereto, for the use and benefit of Parcel II, and that without the consent of Trustee, no buildings, gates, bars or other structures or obstructions shall be erected on the Private Roadway System and no reduction shall be made in the width thereof.

5.  From and after the date of this agreement, Equitable agrees at its expense (except as hereinafter provided) to keep and maintain the aforesaid roadway for motor vehicles over its entire length over the Private Roadway System from Cicero Avenue to Pulaski Road (including that part of said road which lies in Parcel II) in a good state of repair and condition, and when necessary to remove as promptly as reasonably possible snow, ice and debris therefrom, and to keep the Private Roadway System adequately lighted.  Trustee agrees to pay to Equitable for performing such service the annual sum of $3,000 (representing $.0352 per year per square foot of area within that portion of the Private Roadway System located on Parcel II), payable in quarterly installments commencing January 1, 1979 and on each April 1, July 1, October 1 and January 1 thereafter; provided,

-5-

however, that effective with the year 1980 (and the quarterly payments
due in such year) and each year thereafter, the annual payments shall
be increased to $8,000 multiplied by a fraction, the numerator of which is
the CPI (as hereinafter defined in Article VI, Paragraph 5)
for the month of November immediately preceding such year,
and the denominator of which is the CPI for November, 1978.
Trustee's agreement to reimburse Equitable as aforesaid shall
not impose any duty or obligation on Trustee to maintain any
part of the Private Roadway System or to keep the same in a
good state of repair, or to remove any snow, ice or debris
therefrom, or to keep the Private Roadway System adequately
lighted, it being agreed that such duty and obligation is hereby
assumed by, and shall rest solely on, Equitable, its successors
and assigns.  In the event, however, that Equitable shall fail
to no maintain the Private Roadway System, or shall fail to
remove snow, ice or debris therefrom, or to keep the Private
Roadway System adequately lighted, Trustee may, after giving
Equitable not less than twenty (20) days prior notice of its
intention so to do (except in emergencies, when no notice
shall be required except notice to Equitable that an emergency
situation exists which Trustee is commencing to cure), perform
such repairs or maintenance, or remove such snow, ice or debris,
or to take action necessary to insure that the system is ade-
quately lighted, as may be necessary to render the Private Roadway
System usable.  Trustee shall be entitled to reimbursement for
its costs and expenses so incurred.

### Article III
#### Sewer Easements

1.  Equitable hereby grants to Trustee, its successors and
assigns, for the benefit of Parcel II, and the owners, users
and occupiers from time to time thereof, a perpetual, non-

-6-

exclusive easement over that portion of the Sewer Easement Area located in Parcel I and the right to enter the Sewer Easement Area to the extent necessary to assure to Trustee and its successors and assigns the full use and enjoyment of the Sewer System located therein. Said grant includes the right to the use of the portions of the Sewer System located in Tract I.

2.   Trustee hereby grants to Equitable, its successors and assigns, for the benefit of Parcel I, and the owners, users and occupiers from time to time thereof, a perpetual, non-exclusive easement to use that part of the Sewer System lying in Parcel II, and the right to enter the Sewer Easement Area to the ext        ary to assure Equitable the full use, enjoyment, and operation of the Sewer System.

3.   Equitable and Trustee agree and consent that each will maintain so much of the Sewer System as lies within their respective Parcels in good condition and repair, and that neither will use the Sewer System in an improper manner. In the event that either party shall fail to properly repair and maintain so much of the Sewer System as lies within its respective property, the other party shall have the right to enter upon the defaulting party's property for the sole purpose of performing such repair and maintenance on the Sewer System as may be necessary to keep the Sewer System in good operating condition (which right to enter shall be exercised only in the event that the other party fails, refuses or neglects to carry out its obligations hereunder). The party making such repairs and performing such maintenance upon the Sewer System on the other party's property shall be entitled to reimbursement for its costs and expenses so incurred.

4.   Both parties shall have the right to construct and maintain a building or buildings or other improvements upon the

-7-

Sewer Easement Area located on the parcel owned by it, provided that such party shall either (a) first relocate the Sewer System as presently constructed thereon, at its own cost and expense, so that the intended building or buildings or other improvements shall not interfere with the Sewer System's maintenance, proper functioning or use, and grant appropriate easements for relocated facilities; or (b) take whatever measures are necessary, at its own cost and expense, to insure that the said building or buildings and improvements will not interfere with the main- tenance, use or proper functioning of the Sewer System as presently located and constructed.

5.   Equitable reserves the right to grant further easements over the Sewer System Area, and for use of the Sewer System, including that portion thereof lying within Parcel II, to other owners of land forming a part of Parcel I, which easements will similarly be non-exclusive and substantially similar in form and substance to the easements herein granted.

<u>Article IV</u>
<u>Cross-Easements for Parking</u>

1.   Equitable hereby grants to Trustee, its successors and assigns, for the benefit of Parcel II, and the owners, users and occupiers from time to time thereof, a perpetual, non-exclusive easement to park passenger motor vehicles in the Office Parking Spaces, and to enter upon the Office Building Site for that purpose, between the hours of 5:30 p.m. and 7:30 p.m. on each Monday, Tuesday, Wednesday, Thursday and Friday, and all day on Saturdays, Sundays and national holidays.

2.   Trustee hereby grants to Equitable, its successors and assigns, for the benefit of the owner, users and occupiers of the Office Building Site, a perpetual, non-exclusive easement to park passenger motor vehicles in the Apartment Parking Spaces.

-8-

and to enter upon Parcel IX for that purpose between the hours of 7:30 a.m. and 5:30 p.m. on each Monday, Tuesday, Wednesday, Thursday and Friday.

3. No charge will be made to any person for the use and enjoyment of the easements and parking privileges herein granted. Each party hereto shall be responsible for the maintenance and repair of the parking areas (the Office Parking Spaces and the Apartment Parking Spaces) located on their respective parcels, and for removal of snow, ice and debris from the same. In the event (and only in the event) that either party shall fail to properly repair and maintain the aforesaid parking areas located on its Parcel, or shall fail to properly remove snow, ice and debris from the same, the other party shall have the right to enter upon the defaulting party's property for the sole purpose of performing such repair and maintenance, or removing such snow, ice and debris, as may be necessary to render such parking spaces usable. The party making such repairs and performing such maintenance or snow, ice or debris removal on the other party's property shall be entitled to reimbursement for his costs and expenses so incurred.

## Article V
### Supply of Water to Parcel II

1. There are located in Parcel II certain water pipes, lines and mains which originate in Parcel I (including the Water Easement Area). All water currently used in Parcel II is purchased by Equitable from the City of Chicago, and is conveyed to Parcel II through pipes, lines and mains located in Parcel I and Parcel II. The use of such pipes, lines and mains located in the Water Easement Area Property is subject to and governed by the Sweetheart Easements and an Agreement dated August 14, 1966 between Central Industrial District, Inc.

-9-

FILED DATE: 8/20/2019 12:11 PM   2018L008190

FILED DATE: 8/20/2019 12:11 PM    2018L008190

and Sweetheart Cup Corporation, recorded October 19, 1966 as
document 19972008, as amended by Agreement dated October 27,
1966 and recorded October 31, 1966 as document 19982474 and
by Agreement dated September 19, 1969 and recorded December 29, 1969
as document  21045716 .

2.  Subject to the matters referred to in 1. above, Equit-
able hereby grants unto Trustee, its successors and assigns
(a) the right to use existing water pipes, lines and mains and
taps and installations connected therewith located in Parcel II
and use the same for the purpose of conveying water into and
throughout Parcel II, and for other uses benefitting Parcel II,
and (b) the right of ingress to and egress from Parcel I for
the purpose of opening up the mains, pipe lines or any part
thereof, for the purpose of repairing or renewing the same as
occasion may require.

To have, to hold and enjoy forever the rights granted here-
unto to Trustee, its successors and assigns and the future owner
or owners of Parcel II and any part thereof, as appurtenant to
Parcel II and every part thereof.  Equitable shall not be
entitled to any compensation for any connections made by
Trustee with said mains and pipe lines.  However, Trustee shall
pay Equitable for all water consumed by tenants and owners in Parcel II
at the same rate which Equitable shall charge all other users
of water in Parcel I or under any agreement pursuant to which
Equitable sells water to tenants and owners of property not included in
Parcel I but included within the Ford City Complex, but not
more than one hundred and twenty-five percent (125%) of the
then current charge made to Equitable for such water by the
City of Chicago.  In the event that at any time there are no
other users of water who buy their water from Equitable, then
Trustee shall pay Equitable 125% of the charge made to Equitable
for such water by the City of Chicago.  Trustee agrees that

-10-

such charge is reasonable to compensate Equitable for its
capital expenditure and for its maintenance costs as herein
set forth.  Trustee shall pay the cost of acquiring, installing
and maintaining the meters, connections and other fixtures
necessary for the supply of water from the mains and pipes on
Parcel I and on the Sweetheart Property to Parcel II.

3.  Equitable at its expense, hereby covenants and agrees
to keep and maintain the mains, pipe lines, and the parts thereof
located in Parcel I, and which furnish water to Parcel II, in
good operable condition.  If Equitable shall fail, refuse or
neglect to carry out the above undertakings for a period of three
(3) days after receipt of notice in writing from Trustee so to
do, Trustee may (but shall not be obligated so to do) perform
said undertakings, and Equitable hereby agrees to pay to Trustee
upon demand, the cost and expense incurred by Trustee in carry-
ing out such undertakings.

The right of ingress and egress hereinabove granted in
paragraph 2. of this section shall be exercised only when and
if Equitable shall fail, refuse or neglect to carry out its
said undertakings.

### Article VI

### Fire Protection System

1.  There are located in Parcel II and in the Sweet-
heart Property certain privately-owned fire main lines which
originate in Parcel I (including the Water Easement Area).
The use of such fire main lines is subject to an Agreement
dated October 17, 1966 between Central Industrial District, Inc.
and Sweetheart Cup Corporation, recorded October 18, 1966 as
document 19972009 and to the Sweetheart Easements.

2.  Subject to the foregoing matters and to matters referred
to in subparagraph 7 of this Article, Equitable hereby grants
to Trustee the perpetual right to connect to and make use of
all fire lines located in or upon Parcel II (including the Water
Easement Area).

"In the event individual rental apartments on Parcel II are assigned individual
water meters or in the event that Trustee or any of its successors or assigns
shall file a declaration of condominium affecting Parcel II, Equitable's obli-
gation hereunder to sell water for the use of tenants and owners of Parcel II
shall cease and terminate; provided,however,that Equitable shall continue to
sell water on the terms stated herein to any entity created by Trustee for the
purpose of purchasing water for the use of tenants and owners of Parcel II.  In
no event shall Equitable be obligated to sell water directly to individual
condominium unit owners or individual apartment renters on Parcel II."

-11-

3.   Equitable owns a pump located in Parcel I, which pump
forms a part of the fire protection system for Parcel II. Pur-
suant to the terms hereof, such pump shall be kept available
for use by Trustee, its successors and assigns, for a period of
twenty (20) years from the date hereof, or such earlier date
as Trustee installs its own pump.

4.   Subject to the provisions of Paragraph 7 of this Article,
Equitable shall maintain the fire main lines located off Parcel
II and the pump referred to herein in a state of good repair
and operable condition; provided, however, that it is agreed
that Equitable shall have no liability to Trustee or its successors
or assigns or anyone claiming by, through, under or on behalf
thereof, for failure to perform its obligations hereunder except
as any of such shall (i) arise where Trustee or an agent or
representative designated by Trustee has made an inspection of
the fire main lines and the pump, submitted a list of deficiencies,
if any, revealed thereby to Equitable and Equitable has failed to
use due care in correcting such deficiencies that can be corrected,
or (ii) be caused by the gross negligence of Equitable or its
agents in performing its duties hereunder.  Trustee agrees to
protect, defend, indemnify and save harmless Equitable against
and from any and all claims by or on behalf of any person, firm
or corporation arising from the conduct or management of said
fire main lines and pump at any time during the period stated
in paragraphs 2 and 3 above.  From and after the end of such
period, Equitable shall have no further maintenance responsibili-
ties hereunder for such fire main lines and pump.

5.   Trustee shall pay to Equitable ten percent (10%) of the
annual cost of operating, maintaining, repairing, modifying,
replacing and insuring such fire main lines and the pump (inclu-
ding but not limited to repairs, maintenance beyond facilities
on Parcel II, light, water and electricity charges and taxes)
during the period that use of the pump is made available to
and any separate premiums for liability insurance

-12-

FILED DATE: 8/20/2019 12:11 PM  2018L008190

Trustee pursuant to paragraph 3 above.  From and after the date that Trustee installs its own pump as provided in paragraph 3, Trustee shall pay nine percent (9%) of the annual cost of operating, maintaining, repairing, modifying, replacing and insuring (including any separate premiums for liability insurance) the fire main lines.  In the event that Trustee installs its own fire main line system, Trustee shall from and after the date that Trustee ceases to use the fire main line system located on Parcel I, have no further obligation to pay any part of the cost of maintaining, repairing, etc. said fire main line system. Notwithstanding the foregoing, Trustee and its successors and assigns as owners of Parcel II shall not be required to pay pursuant to the provisions of this subparagraph for any calendar year prior to 1989 an amount exceeding the "Cost-Sharing Limit" applicable to such year.  For purposes hereof, the Cost-Sharing Limit applicable to any year shall be determined as follows:

   A.   The Cost-Sharing Limit applicable to 1978 shall be $400.

   B.   The Cost-Sharing Limit applicable to 1979 shall be $5,000.

   C.   The Cost-Sharing Limit applicable to any subsequent year prior to 1989 shall be equal to $5,000 (except in any year in which Trustee makes no use of the fire pump, such figure shall be $4,500) multiplied by a fraction, the numerator of which is the "CPI" (as hereinafter defined) for June during such year and the denominator of which is the CPI for June 1979.  The "CPI" shall be the Consumer Price Index -- U.S. City Average for Urban Wage Earners and Clerical Workers, All Items, published by the U.S. Department of Labor, Bureau of Labor Statistics. If the CPI shall be substantially revised, the calculations hereunder shall be appropriately adjusted to produce results as nearly equivalent as possible to those which would have been obtained if the CPI had not been so revised.  If the CPI is discontinued or is unavailable, Equitable will substitute a

-13-

comparable index reflecting changes in the cost of living or
purchasing power of the consumer dollar, published by any other
governmental agency, bank of other financial institution, or
any other recognized authority.  There shall be no Cost-Sharing
Limit applicable after January 1, 1989.

6.  Equitable and Trustee hereby waive any claim which may
arise against the other party hereto during the term of this
agreement, or any renewal or extension thereof, for any loss or
damage to any of its property located within, upon, or consti-
tuting a part of Parcel II, which loss or damage is the result
of a fire on Parcel II and is covered by a valid and collectible
fire and extended coverage insurance policy or policies, to the
extent that such loss or damage is recoverable under said insurance
policy or policies provided the insurer or insurers agree to
such provision, otherwise to be of no force and effect.  Equit-
able and Trustee each agree to notify its own insurance company
or companies, which have issued, or will issue, fire and
extended coverage insurance policies for Parcel II, or anything
located therein, and to have said policies properly endorsed,
if necessary, to prevent the invalidation of said insurance
coverage by reason of this mutual waiver, provided the insurer
or insurers agree to such endorsement, otherwise to be of no
force and effect.  This provision shall not apply to any pur-
chaser of a residential unit on Parcel II following the filing
of a declaration of condominium  under the Illinois Condominium
Property Act.

7.  Notwithstanding anything in this Article to the contrary,
the rights granted by Equitable under this Article to use the
fire main lines and the pump shall cease within 365 days following
notice from Equitable (or its successors or assigns in title
to Parcel I) that it desires to cease all use of the fire main
line system and pump for the benefit of the owners of the Equit-
able Real Estate (provided that such use has at the expiration
of such notice actually ceased).  Such notice shall specify

-14-

whether Equitable desires to remove or disable the fire main
lines and/or pump, or whether Equitable intends to leave such
fire main line system and/or pump in place, in which latter
event Trustee may elect to continue the use thereof by
notifying Equitable of its agreement to assume all maintenance
obligations for such fire main line system and/or pump (with
Equitable assigning to Trustee all Equitable's rights, if any,
to collect a portion of the cost thereof from owners of property
adjoining or included within Parcel I). In the event Equitable
notifies Trustee that it intends to remove or disable the fire
main line system in any way so that the same shall be inoperative,
Equitable and its successors and assigns shall be required to
grant to Trustee and its successors in title to Parcel II an
easement or easements across Parcel I sufficient to enable
such parties to install and maintain an alternative fire main
line system and pump extending from a City of Chicago water
main located in S. Cicero Avenue or other public street, failing
which the obligations of Equitable under the remainder of this
Article shall continue in full force and effect, notwithstanding
the sending of the foregoing notice. Such easement shall be
executed and delivered by Equitable and/or its successors in
title to Parcel I within 90 days following the original notice
from Equitable of its intention to remove or disable such fire
main system.

### Article VII

### Maintenance of Parcel II

1. Trustee and Equitable acknowledge that the exterior
appearance of their respective parcels may have a significant
impact upon the other party's property. Therefore, each party
hereto, for itself and its successors and assigns, agrees
and covenants that it will maintain its respective property in
good condition and repair, subject to ordinary wear and tear,
will not commit or suffer waste, and will comply with, or cause
to be complied with, all statutes, ordinances and requirements

-15-

of any governmental authority relating to its respective
property; and will, in the event of damage or destruction of
buildings and improvements upon its property, promptly repair
and replace same, or, in the event that such buildings and
improvements are not to be repaired or replaced, promptly
remove all debris therefrom, it being intended hereby that each
party will maintain the appearance of its property at a standard
comparable to that of Ford City Complex as a whole in any event
at such standard as will not detract from or diminish the value
of Ford City Complex or any part thereof (including Parcel II).
The provisions of this Article shall cease and terminate on the
first to occur of:

(a) the 20th anniversary of the date of this
Agreement; or

(b) the date on which Equitable owns no portion
of the Equitable Real Estate or the 10th anniversary
of the date of this Agreement, whichever occurs last.

### Article VIII
### Parties Benefitted and Bound

This Agreement shall be binding upon and inure to the
benefit of the parties hereto and their respective successors
and assigns, and the future owner or owners of the parcels of
real estate described in this instrument.  All easements granted
herein to Trustee shall be appurtenant to the land described as
Parcel II, and all easements granted herein to Equitable shall
be appurtenant to the land included in Parcel I.  All covenants
of Equitable shall run with the land included in Parcel I, and
all covenants of Trustee shall run with the land included in
Parcel II.  From and after the date when any party shall cease
to own legally or beneficially any part of the land affected
hereby, such party shall be personally released from any
liability or responsibility hereunder, all such liability and

Subject to the provisions of Article X hereof,

-16-

FILED DATE: 8/20/2019 12:11 PM   2018L008190

responsibility accruing to such party's successors and assigns,
provided, however, that upon conveyance by Equitable of the last
of the Equitable Real Estate, the grantee thereof shall be responsi-
ble for all of the maintenance obligations of Equitable hereunder.

### Article IX

#### Time of Payment of Reimbursement; Lien Rights .

Any party who is obligated hereunder to pay or reimburse
any other party for expenses incurred or for water supplied by
such other party shall make such payment or reimbursement within
fifteen (15) days after a request for such payment or reimburse-
ment, in reasonably specific form, is submitted to the party of
whom such payment or reimbursement is requested.  In the event
of any failure of any party to make payment or reimbursement
as provided in this Agreement, the party seeking such payment
or reimbursement shall be entitled to a lien for the amount of
such obligation on all real estate within Parcel I or Parcel II,
as the case may be, owned by the party obligated for such pay-
ment or reimbursement.  Such lien shall be subordinate to the
lien of any mortgage on such property.  To be effective, such
lien must be claimed by filing a written notice thereof in the
real estate records of Cook County, Illinois, and shall expire
without further action of any party if an action to enforce it
is not filed in a court having jurisdiction within one (1) year
after the water supplied or work giving rise to such claim for
lien has been completed.

### Article X

#### Dedication or Conveyance of Streets and Utilities

Notwithstanding any other provision herein to the contrary,
Trustee, for itself, its beneficiaries and successors and assigns,
agrees that:

-17-

1.   Trustee shall, upon Equitable's request, cooperate
and join in the dedication to the City of Chicago, the Metropolitan
Sanitary District, or any other appropriate governmental authority,
of any or all of the Private Roadway System, the Sewer System,
the Domestic Water System described in Article V hereof, and the
Fire Protection System described in Article VI hereof, and shall
execute any deeds, documents or instruments of conveyance or
dedication necessary to affect such dedication; provided, however,
that Equitable shall pay all construction and other costs
necessary to accomplish such dedication.  Upon acceptance of
such dedication by the City, authority or other governmental
entity to whom such dedication is made, both Equitable and
Trustee shall be deemed released from all liability and responsi-
bility hereunder for the facilities so dedicated and accepted.

2.   Equitable shall be released from all liability and
responsibility hereunder upon any conveyance by Equitable of
its interest in the Private Roadway System, the Sewer System,
the Domestic Water System described in Article V hereof, or the
Fire Protection System described in Article VI hereof to any
corporation or association in the nature of a property-owners'
association, membership in or voting control of which is vested
in the owners of Parcels I and II from time to time and which
assumes Equitable's obligation hereunder, whether Equitable
retains legal or beneficial ownership of the Equitable Real
Estate or not.  Upon Equitable's request, Trustee shall convey
any portion of the Private Roadway System, the Sewer System,
the Domestic Water System described in Article V hereof, or the
Fire Protection System described in Article VI hereof owned by
Trustee to such grantee for consideration of one dollar ($1.00),
and shall cooperate in the creation of such a grantee.

-18-

FILED DATE: 8/20/2019 12:11 PM   2018L008190

### Article XI

### Trustee's Exculpation

This Agreement is executed by Trustee solely in the exercise of the authority conferred upon it as Trustee as aforesaid, and no personal liability or responsibility shall be assumed by, nor at any time be asserted or enforced against it, its agents or employees on account hereof, or on account of any promises, covenants, undertakings or agreements herein contained, either expressed or implied; all such liability, if any, being expressly waived and released by every person now or hereafter claiming any right or security hereunder. It is understood and agreed that Trustee shall have no obligation to see to the performance or nonperformance of any of the covenants or promises herein contained, and shall not be liable for any action or non-action taken in violation of any of the covenants herein contained.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

ATTEST:

_____
Assistant Secretary

THE EQUITABLE LIFE ASSURANCE
  SOCIETY OF THE UNITED STATES

BY _____
        Vice President

ATTEST:

_____
Assistant Secretary

AMERICAN NATIONAL BANK AND TRUST
  COMPANY OF CHICAGO, not personally
  but as trustee aforesaid

BY _____
        Vice President

-19-

FILED DATE: 8/20/2019 12:11 PM　2018L008190

STATE OF ILLINOIS )
　　　　　　　　　　) SS.
COUNTY OF COOK　　)

The foregoing instrument was acknowledged before me

this _30th_ day of November, 1978 by _Ira M. vites_

Vice President and _Helen C. Patrick_, Assistant Secretary,

of The Equitable Life Assurance Society of the United States,

a New York corporation, on behalf of the corporation.

_J. C. Weir_
　　　　　　　　　　　　Notary Public

My commission expires: _2/26/80_

STATE OF ILLINOIS )
　　　　　　　　　　) SS.
COUNTY OF COOK　　)

The foregoing instrument was acknowledged before me

this _____ day of _____ 1978 by _Thomas Michaels_,

Vice President and _____, Assistant Secretary,

of American National Bank and Trust Company of Chicago, a

national banking association, on behalf of said national banking

association.

_Dawn Pitcl_
　　　　　　　　　　　　Notary Public

My commission expires: _APR 2, 1982_

FILED DATE: 8/20/2019 12:11 PM   2018L008190

Easement Agt

# E X H I B I T   A

## Legal Description of Parcel 1

Parcel 1:
Parts of the North three-quarters of Section 27 and the South West quarter of Section 22, Township 38 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois described as follows: Beginning at the intersection of the East line of South Cicero Avenue, as per document 19563728 (said East line being 60 feet East of and parallel to the West line of said Section 27) and Northerly line of West 77th Street as dedicated by document 13812343; thence North along said East line of South Cicero Avenue, 3127.02 feet to a point 2633.50 feet North (as measured along said East line of South Cicero Avenue) from a straight line, hereinafter referred to as "Line A") which extends East from a point on the West line of said Section 27 which point is 644.66 feet South from the North West corner of the South half of said Section 27 to a point on the East line of said Section 27 which point is 619.17 feet South from the North East corner of said South half; thence East along a line 2633.50 feet North of and parallel to line 'A', a distance of 8.40 feet to a point of curve which is 8.40 feet East of said East line of South Cicero Avenue and 2633.50 feet North of said Line 'A' thence along a curved line with a radius of 76.375 feet and concave to the North West, a distance of 46.66 feet to a point of tangency, thence Northeasterly along a straight line which makes an angle of 35 degrees 00 minutes with the last described straight line extended a distance of 73.13 feet to a point of curve, thence along a curved line with a radius of 83.75 feet and concave to the South East a distance of 51.16 feet to a point.of tangency which is 2704.50 feet North of said line 'A' and 170.44 feet East of said East line of South Cicero Avenue; thence East along a line 2704.50 feet North of and parallel to said Lot 'A' a distance of 22.58 feet to the East line of the West 243 feet of said Section 27; thence North along said East line of the West 243 feet of Section 27, a distance of 19 feet to a point in a line 2723.50 feet North of and parallel to said Lot 'A' thence East along said line, 2723.50 feet North of and parallel to Line 'A', a distance of 897 feet to the East line of the West 1140 feet (measured perpendicularly) of said Section 27; thence North along said East line of the West 1140 feet of Section 27; a distance of 81 feet to a point in a line 2804.50 feet North of and parallel to said Lot 'A', thence East along said line, 2804.50 feet North of and parallel to Line 'A', a distance of 48.50 feet to the East line of the West 1188.50 feet (measured perpendicularly) of said Section 27, thence North along said East line of the West 1188.50 feet of Section 27, a distance of 71.50 feet to a point in a line 2876.00 feet North of and parallel to said Lot 'A', thence East along said line 2876.00 feet North of and parallel to Line 'A', a distance of 57 feet to the East line of the West 1245.50 feet (measured perpendicularly) of said Section 27; thence North along said East line of the West 1245.50 feet of Section 27, a distance of 103 feet to a point in a line 2979 feet North of and parallel to said line 'A'; thence East along said line 2979 feet North of and parallel to Lot North 'A' a distance of 162 feet to the East line of the West 1407.50 feet (measured perpendicularly) of said Section 27; thence North along said East line of the West 1407.50 feet of Section 27 and along said line extended, a distance of 395.32 feet to a point in a straight line which extends South Eastwardly from a point which is 75 feet (measured perpendicularly) East from the West line and 571.56 feet (measured perpendicularly) North from the South line of said South West quarter of Section 22 to a point in the North and South center line of said Section 27 which point in said center line is 401.70 feet (measured along said center line) South from the North line of said Section 27; thence South Eastwardly along said straight

24 748 418

FILED DATE: 8/20/2019 12:11 PM   2018L008190

line which if extended South Eastwardly would intersect the North
and South center line of Section 27 at a point 401.70 feet South
of the North line of Section 27, a distance of 1329.41 feet to said
point in the North and South line of Section 27 which is 401.70
feet South of the North line of Section 27; thence South Eastwardly
along a straight line which if extended South Eastwardly would
intersect the East line of said Section 27 at a point which is 1145
feet (measured along said East line) South from the North East
corner of the North East quarter of said Section 27, a distance of
803.10 feet to the East line of the West 3516 feet (measured
perpendicularly) of said Section 27, thence South along the South
line of the West 3516 feet, a distance of 694.68 feet to a line
3956 feet North of and parallel to said line 'A', thence West along
said line 3956 feet North of and parallel to said line 'A' a distance
of 1030 feet to the East line of the West 2506 feet (measured
perpendicularly) of said Section 27, thence South along said East
line of the West 2506 feet, a distance of 1935.00 feet to the line
20.00 feet North of and parallel to said line 'A', thence East along
said line 20.00 feet North of and parallel to said Lot 'A' a distance
of 1030.00 feet to the East line of the West 3536.00 feet of said
Section 27, thence South along said East line of the West 3536.00
feet, a distance of 20.00 feet to said Line 'A' thence East along
said line 'A' a distance of 1704.44 feet to the West line of South
Pulaski Road, as per document 19563728, said West line of South
Pulaski Road being 70.00 feet West of the East line of said Section
27, thence South along said West line of South Pulaski Road (said
West line being 70.00 feet West of and parallel to the East line of
said Section 27) a distance of 236.59 feet, thence Southeastwardly
along a line, a distance of 161.05 feet, to a point, said point
being 50.00 feet West of said East line of Section 27, thence South
along the West line of South Pulaski Road (said West line being
50.00 feet West of and parallel to the East line of said Section 27)
a distance of 31.15 feet to a corner of the land heretofore dedicated
for a public street by a plat recorded in the Recorder's Office of
Cook County, Illinois as document 13112544, which corner is 251.92
feet, more or less, North from the South line of the North half of
the South half of said Section 27, thence Southeastwardly along a
line of said land, so dedicated, being the arc of a circle having
a radius of 65 feet and convex Southeastwardly, a distance of 94.42
feet to a point which is 107.00 feet (measured perpendicularly) West
from said East line of Section 27 and 187.00 feet (measured
perpendicularly) North from said South line of the North half of
the South half of Section 27, thence Westwardly along a line of
said land, so dedicated, a distance of 715.02 feet to a point 120.00
feet (measured parallel to the East line of said Section 27) North
from said South line of the North half of the South half of Section
27, thence South, a distance of 120.00 feet to a point on said South
line of the North half of the South half which is 520.00 feet
West from the South East corner of said North half of the South
half of Section 27, thence West along said South line of the
North half of Section 27, a distance of 3161.94 feet to the South
East corner of the North West quarter of the South West quarter
of said Section 27, thence North along the East line of said North
West quarter of the South West quarter of Section 27, a distance
of 33.00 feet, thence West, parallel with said South line of the
North half of the South half of Section 27, being the North line
of West 77th Street, a distance of 512.32 feet to a corner of said
land dedicated by document 13112543, which corner is 765.00 feet
East from the East line of South Cicero Avenue, thence North,
perpendicular to said North line of West 77th Street, along a line
of said land, a distance of 77.00 feet, thence Westwardly along a
line of said land, so dedicated, a distance of 760.76 feet to the
point of beginning;

2 of 6

FILED DATE: 8/20/2019 12:11 PM 2018L008190

(Exception No. 1):
A part of the North three-quarters of Section 27, Township 38 North,
Range 13 East of the Third Principal Meridian, in Cook County,
Illinois which part is more particularly described as follows:
Beginning at the intersection of said Line 'A' with the East line
of the West 50 feet of said Section 27 and running thence East along
said line 'A', a distance of 1544.00 feet to the East line of the
West 1894.00 feet (measured perpendicularly) of said Section 27;
thence North along said East line of the West 1894.00 feet, a distance
of 2552.50 feet to the point of beginning, thence West along a line
2553.50 feet North of and parallel to said Line 'A', a distance of
92.00 feet, thence North along the East line of the West 1802.00
feet (measured perpendicularly) of said Section 27, a distance of
74.00 feet, thence East along a line 2627.50 feet North of and
parallel to said line 'A', a distance of 32.00 feet, thence South
along the East line of the West 1834.00 feet (measured perpendicularly)
of said Section 27, a distance of 3.00 feet, thence East along a line
2624.50 feet North of and parallel to said Line 'A', a distance of
60.00 feet, thence South along said East line of the West 1894.00
feet of Section 27, a distance of 71.00 feet to the point of beginning;
and also excepting:

(Exception No. 2):
A part of the North three-quarters of Section 27, Township 38 North,
Range 13 East of the Third Principal Meridian, in Cook County,
Illinois which part is more particularly described as follows:
Beginning at the intersection of said line 'A' with the East line
of the West 50 feet of said Section 27 and running thence East along
said Line "A", a distance of 2389.00 feet to the East line of the
West 2419.00 feet (measured perpendicularly) of said Section 27;
thence North along said East line of the West 2419.00 feet, a distance
of 1453.00 feet to the point of beginning, thence West along a line
1473.00 feet North of and parallel to said Line "A", a distance of
202.50 feet, thence North along the East line of the West 2216.50
feet (measured perpendicularly) of said Section 27, a distance of
501.50 feet, thence East along a line 1955.50 feet North of and
parallel to said Line "A", a distance of 202.50 feet, thence South
along said East line of the West 2419.00 feet of said Section 27,
a distance of 501.50 feet to the point of beginning;

(Exception No. 3):
A part of the North three-quarters of Section 27, Township 38 North,
Range 13 East of the Third Principal Meridian, described as follows:
Beginning at the point of intersection of the East line of the West
2517.00 feet (measured perpendicularly) of said Section 27 with said
line "A" and running thence North along said East line of the West
2517.00 feet, a distance of 2357.20 feet to the point of beginning
of this tract, thence East, parallel to said Line "A", 501.00 feet
to the East line of the West 3016.00 feet (measured perpendicularly)
of said Section 27, thence North, along said East line of the West
3016.00 feet, a distance of 353.16 feet, thence Northwesterly by
following three courses along a line 23.00 feet South of (by Normal
measurement) the center line of the existing Southerly railroad
track; North 73 degrees 55 minutes 10 seconds West, a distance of
91.55 feet to a point of curve, thence along the arc of a circle
tangent of the last course, convex to the South West and having a
radius of 2867.23 feet, 250.90 feet to a point of tangency, thence
North 68 degrees 56 minutes 30 seconds West, tangent to said curve
a distance of 187.80 feet to a point in said East line of the West
2517.00 feet of said Section 27, which point is 2883.08 feet North
of said Line "A", thence South along said East line of the West
2517.00 feet, a distance of 151.37 feet, thence East, parallel to
said Line "A", 109.00 feet, thence South, parallel to said West line
of said Section 27, a distance of 47.11 feet, thence West, parallel
to said Line "A", 109.00 feet, thence South, along said East line of
the West 2517.00 feet, a distance of 327.40 feet to the point of
Beginning;

3 of 6

FILED DATE: 8/20/2019 12:11 PM   2018L008190

(Exception No. 4):
That part of the North three-quarters of Section 27, Township 38
East of the Third Principal Meridian, bounded and
described as follows: Beginning at the point which is 2419.30 feet
measured perpendicularly, East from the West line of said Section 27
and on a line which is 2511.33 feet North from a parallel with said
Line "A", thence West, along said parallel line, a distance of 176.00
feet, thence North, along a line perpendicular to said parallel line
a distance of 80.00 feet, thence West, along a line parallel with
said Line "A", a distance of 79.00 feet to its intersection with a
line which is 2164.30 feet, measured perpendicularly, East from and
parallel with the West line of said Section 27, thence North, along
the last described parallel line, a distance of 90.00 feet; to its
intersection with a line which is 2551.33 feet North from and parallel
with said Line "A", thence East, along the last described parallel
line, a distance of 254.21 feet, thence Southwardly, along the
arc of a circle, convex to the East and having a radius of 402.25
feet, a distance of 27.14 feet to a point which is 2419.30 feet,
measured perpendicularly, East from the West line of said Section
27 and 2554.21 feet North from said Line "A", and thence South,
along a straight line, a distance of 142.88 feet to the point of
beginning;

(Exception 5):
Part of the North three-quarters of Section 27, Township 38 North,
Range 13 East of the Third Principal Meridian, described as
follows: Beginning at the intersection of said Line "A" with the
East line of the West 2216.50 feet of said Section 27, thence North
along said East line of the West 2216.50 feet of Section 27, a
distance of 1453.50 feet to the point of beginning, thence East
along a line parallel to said Line "A", a distance of 202.50 feet,
thence South perpendicular to said line, a distance of 33.00 feet,
thence West along a line parallel to said Line "A", a distance of
202.50 feet, thence North perpendicular to said line a distance of
33.00 feet to the point of beginning;

(Exception 6):
Part of the North three-quarters of Section 27, Township 38 North,
Range 13 East of the Third Principal Meridian, described as
follows: Beginning at the intersection of a straight line herein-
after referred to as Line "A" which extends East from a point on
the West line of said Section 27 which is 844.86 feet South from
the North West corner of the South half of said Section to a point
on the East line of said Section 27, which is 639.17 feet South
from the North East corner of said South half with the East line of
the West 2140.00 feet of said Section 27; thence North along the
East line of the West 2140.00 feet a distance of 1453.50 feet North
of said Line "A" to the point of beginning; thence East along a
line parallel to said Line "A", a distance of 76.50 feet, thence
North perpendicular to said Line "A", a distance of 501.50 feet
thence West along a line parallel to said Line "A", a distance of
76.50 feet, thence South perpendicular to said Line "A", a distance
of 501.50 feet to the point of beginning;

(Exception 7):
A part of the North three-quarters of Section 27, Township 38
North, Range 13 East of the Third Principal Meridian, which part
is more particularly described as follows: Beginning at the
intersection of a straight line, hereinafter referred to a Line
"A", which extends East from a point on the West line of said
Section 27 which is 844.86 feet South from the North West corner
of the South half of said Section to a point on the East line of
said Section 27 which is 639.17 feet South from the North East
corner of said South half, with the East line of the West 50 feet
of said Section 27 and running thence East along said Line "A"
a distance of 2467.00 feet to the East line of the West 2917.00

4 of 6

feet (measured perpendicularly) of said Section 27, thence North along said East line of the West 2517.00 feet a distance of 20.00 feet to the point of beginning, thence West along a line 20.00 feet North of and parallel to said line "A" a distance of 11.00 feet; thence North along the East line of the West 2506.00 feet (measured perpendicularly) of said Section 27 a distance of 1935.00 feet, thence East along a line 1955.00 feet North of and parallel to said Line"A" a distance of 11.00 feet, thence South along said East line of the West 2517.00 feet of Section 27 a distance of 1935.00 feet to the point of beginning;

(Exception 8):
A part of the North East quarter of Section 27, Township 38 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois, which part is more particularly described as follows: Beginning at the point of intersection of the East line of the West 3018.00 feet (measured perpendicularly) of said Section 27 with a straight line, hereinafter referred to as line 'A', which extends East from a point on the West line of said Section 27 which is 644.66 feet South from the North West corner of the South half of said Section to a point on the East line of said Section 27 which is 619.17 feet South from the North East corner of said South half, thence North along said line of the West 3018.00 feet a distance of 1955.00 feet to the point of beginning, thence East along a line 1955.00 feet North of and parallel to said Line "A" a distance of 498.00 feet, thence North along the East line of the West 2516.00 feet (measured perpendicularly) of said Section 27, a distance of 604.68 feet, more or less to its intersection with a straight line extending Southeastwardly from a point on the North and South center line of said Section 27 which is 401.70 feet (measured along said center line) South from the North line of said Section 27 to a point on the East line of said Section 27 which is 2145.00 feet South from the North East corner thereof, thence North-westerly along said last described straight line a distance of 818.21 feet, more or less, to its intersection with said East line of the West 3018.00 feet of Section 27, thence South along said East line of the West 3018.00 feet a distance of 837.83 feet to the point of beginning;

(Exception 9):
That part of the North 3/4 of Section 27, Township 38 North, Range 13 East of the Third Principal Meridian described as follows: Beginning at the intersection of a line 4205.31 feet East of and parallel with the West line of said Section 27 and a line hereinafter referred to as Line "A" which extends East from a point on the West line of said Section 27 which is 644.66 feet South from the Northwest corner of the South 1/2 of said Section 27 to a point on the East line of said Section 27 which is 619.17 feet South from the Northeast corner of said South 1/2; thence South, along said line 4205.31 feet East 642.50 feet; thence East, parallel with the South line of the North 1/2 of the South 1/2 of said Section 27, 283.98 feet, to the West line of the road as dedicated by Document 13 317 544; thence North, along the West line of said road, 56.21 feet, to the Northwest corner of said road; thence Northeasterly along the Northwesterly line of said road, 508.35 feet, to a line 4995.53 feet East of and parallel with the West line of said Section 27; thence North along said line 4995.53 feet East, 541.29 feet, to said Line "A"; thence West, along said Line "A", 790.22 feet, to the point of beginning, in Cook County, Illinois;

5 of 6

FILED DATE: 8/20/2019 12:11 PM   2018L008190

FILED DATE: 8/20/2019 12:11 PM  2018L008190

(Exception 10: :

That part of the North 3/4 of Section 27, Township 38 North,
Range 13 East of the Third Principal Meridian described as
follows:  Commencing at the intersection of a line 3526.00 feet
East of and parallel with the West line of said Section 27 and
a line 20 feet North of and parallel with a line hereinafter
referred to as Line "A", which extends East from a point on
the West line of said Section 27 which is 644.66 feet South
from the Northwest corner of the South 1/2 of said Section 27
to a point on the East line of said Section 27 which is 619.17
feet South from the Northeast corner of said South 1/2; thence
West along said line 20.00 feet North, 122.72 feet, to the point
of beginning of the land herein described; thence South along a
line making an interior angle of 88° 36' 00", 723.89 feet, to
the South line of the North 1/2 of the South 1/2 of said Section
27; thence West, along said South line of the North 1/2 of the
South 1/2, 890.01 feet, to a line 2506.00 feet East of and
parallel to the West line of said Section 27; thence North
along said line 2506.00 feet East, 436.29 feet, to a line
264.26 feet South of and parallel with said Line "A"; thence
East, along said line 264.26 feet South, 257.86 feet to a
line 2763.86 feet East of and parallel with West line of
Section 27; thence North, along said line 2763.86 feet East,
284.26 feet, to said line 20.00 feet North of Line "A"; thence
East, along said line 20.00 feet North, 649.84 feet to the
point of beginning, in Cook County, Illinois.

Also:


Parcel 2:
A triangular parcel of land in the North East quarter of Section
28, Township 38 North, Range 13 East of the Third Principal Meridian,
lying Southeast of the Southeasterly line of State Road (being 50
feet Southeasterly at right angles to the center line of said State
Road), and also lying West of the East 57 feet of said quarter section
and North of a line drawn at right angles through a point on the West
line of said East 57 feet, said point being 300 feet North of the
South line of the North East quarter aforesaid all in Cook County,
Illinois.

6 of 6

FILED DATE: 8/20/2019 12:11 PM   2018L008190

**E X H I B I T  B**  Easement Agt

<u>Legal Description of Parcel II</u>

That part of the North 3/4 of Section 27, Township 39 North,
Range 13 East of the 3rd Principal Meridian described as follows:
Commencing at the intersection of a line 3516.00 feet East of and
parallel with the West line of said Section 27 and a line 20 feet
North of and parallel with a line hereinafter referred to as
"Line A", which extends East from a point on the West line of
said Section 27 which is 644.66 feet South from the Northwest
corner of the South 1/2 of said Section 27 to a point on the East
line of said Section 27 which is 619.17 feet South from the
Northeast corner of said South 1/2; thence West along said line
20.00 feet North, 122.72 feet, to the point of beginning of the
land hereon described; thence South along a line making an interior
angle of 85° 36' 00", 723.89 feet, to the South line of the North
1/2 of the South 1/2 of said Section 27; thence West, along said
South line of the North 1/2 of the South 1/2, 890.01 feet, to a
line 2506.00 feet East of and parallel to the West line of said
Section 27; thence North along said line 2506.00 feet East,
436.29 feet, to a line 264.26 feet South of and parallel with said
"Line A"; thence East, along said line 264.26 feet South, 257.86
feet to a line 2763.86 feet East of and parallel with West line of
Section 27; thence North, along said line 2763.86 feet East,
284.26 feet, to said line 20.00 feet North of "Line A"; thence East,
along said line 20.00 feet North, 649.86 feet to the point of
beginning, in Cook County, Illinois.

**EXHIBIT C**

A PART OF THE NORTH 3/4 OF SECTION 22, TOWNSHIP 38 NORTH, RANGE 13 EAST
OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, WHICH PART IS
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF A STRAIGHT LINE, HEREINAFTER REFERRED
TO AS "LINE A" WHICH EXTENDS EAST FROM A POINT ON THE WEST LINE OF
SAID SECTION 27, WHICH IS 644.66 FEET SOUTH FROM THE NORTHWEST CORNER
OF THE SOUTH 1/2 OF SAID SECTION, TO A POINT ON THE EAST LINE OF SAID
SECTION 27, WHICH IS 819.17 FEET SOUTH FROM THE NORTHEAST CORNER OF
SAID SOUTH 1/2 WITH THE EAST LINE OF THE WEST 60 FEET OF SAID SECTION 27,
BEING THE EAST LINE OF SOUTH CICERO AVENUE, AND RUNNING THENCE EAST ALONG
SAID "LINE A" A DISTANCE OF 2494.00 FEET TO THE EAST LINE OF THE WEST
2484.00 FEET (MEASURED PERPENDICULARLY) OF SAID SECTION 27, FOR THE POINT
OF BEGINNING; THENCE SOUTH ALONG SAID EAST LINE OF THE WEST 2484.00 FEET
OF SAID SECTION 27, A DISTANCE OF 595.98 FEET; THENCE WEST ALONG A LINE
104.50 FEET NORTH OF AND PARALLEL TO THE SOUTH LINE OF THE NORTH 1/2 OF
THE SOUTH 1/2 OF SAID SECTION 27, A DISTANCE OF 1669.90 FEET TO A POINT
IN THE EAST LINE OF THE LAND HERETOFORE DEDICATED FOR A PUBLIC STREET,
BY A PLAT RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS
AS DOCUMENT 13112543; THENCE SOUTH ALONG SAID EAST LINE OF THE LAND
DEDICATED FOR STREET BY DOCUMENT 13112543, WHICH LINE IS 235.00 FEET EAST
OF AND PARALLEL TO THE EAST LINE OF SOUTH CICERO AVENUE, A DISTANCE OF
49.50 FEET; THENCE EAST ALONG A LINE 55.00 FEET NORTH OF AND PARALLEL TO
SAID SOUTH LINE OF THE NORTH 1/2 OF THE SOUTH 1/2 OF SECTION 27, A DISTANCE
OF 3674.19 FEET TO A POINT ON THE WEST LINE OF THE LAND HERETOFORE DEDICATED
FOR A PUBLIC STREET BY A PLAT RECORDED IN THE RECORDER'S OFFICE OF COOK
COUNTY, ILLINOIS, AS DOCUMENT 13112544; THENCE NORTH ALONG SAID WEST LINE
OF THE LAND DEDICATED FOR STREET BY DOCUMENT 13112544, WHICH LINE IS  820.0
FEET WEST OF AND PARALLEL TO THE EAST LINE OF SAID SECTION 27, A DISTANCE
OF 49.50 FEET; THENCE WEST ALONG SAID LINE 104.50 FEET NORTH OF AND PARALLEL
TO THE SOUTH LINE OF THE NORTH 1/2 OF THE SOUTH 1/2 OF SECTION 27, A
DISTANCE OF 1969.07 FEET TO THE EAST LINE OF THE WEST 2529.00 FEET OF
SAID SECTION 27; THENCE NORTH ALONG SAID EAST LINE OF THE WEST 2529.00
FEET OF SAID SECTION 27, A DISTANCE OF 572.13 FEET; THENCE EAST ALONG A
LINE 24.00 FEET SOUTH OF AND PARALLEL TO SAID "LINE A", A DISTANCE OF
2756.40 FEET, MORE OR LESS, TO THE WEST LINE OF SOUTH PULASKI ROAD; THENCE
NORTH ALONG SAID WEST LINE OF SOUTH PULASKI ROAD A DISTANCE OF 266.00
FEET; THENCE SOUTHEAST 223.38 FEET TO A POINT IN A LINE 50 FEET NORTH OF
AND PARALLEL TO SAID "LINE A" SAID POINT BEING 117.84 FEET WEST OF THE WEST
LINE OF SOUTH PULASKI ROAD; THENCE WEST ALONG A LINE 50.00 FEET NORTH OF AN
PARALLEL TO SAID "LINE A" A DISTANCE OF 1590.69 FEET, MORE OR LESS. TO
THE EAST LINE OF THE WEST 3538.00 FEET OF SAID SECTION 27; THENCE NORTH
ALONG SAID EAST LINE OF THE WEST 3536.00 FEET OF SECTION 27, A DISTANCE OF
14.50 FEET; THENCE WEST ALONG A LINE 64.00 FEET NORTH OF AND PARALLEL TO
SAID "LINE A" A DISTANCE OF 1007.00 FEET; THENCE NORTH, ALONG THE EAST
LINE OF THE WEST 2529.00 FEET OF SAID SECTION 27, A DISTANCE OF 2639.50
FEET; THENCE WEST ALONG A LINE 2729.50 FEET NORTH OF AND PARALLEL TO SAID
"LINE A" A DISTANCE OF 2308.56 FEET TO A POINT OF CURVE WHICH IS 170.44
FEET EAST OF SAID EAST LINE OF SOUTH CICERO AVENUE; THENCE ALONG A CURVED
LINE WITH A RADIUS OF 102.75 FEET AND CONCAVE TO THE SOUTHEAST, A DISTANCE
OF 62.77 FEET TO A POINT OF TANGENCY; THENCE SOUTHEASTERLY ALONG A STRAIGHT
LINE, WHICH MAKES AN ANGLE OF 35 DEGREES 00 MINUTES WITH THE LAST DESCRIBED
STRAIGHT LINE EXTENDED, A DISTANCE OF 73.13 FEET TO A POINT OF CURVE;
THENCE ALONG A CURVED LINE WITH A RADIUS OF 57.875 FEET AND CONCAVE TO THE
NORTHWEST, A DISTANCE OF 35.35 FEET TO A POINT OF TANGENCY, WHICH POINT OF
TANGENCY IS ON A LINE 2652.50 FEET NORTH OF AND PARALLEL TO SAID "LINE A"
THENCE WEST ALONG SAID LINE 2652.50 FEET NORTH OF AND PARALLEL TO "LINE A"
A DISTANCE OF 18.40 FEET TO SAID EAST LINE OF CICERO AVENUE; THENCE SOUTH
ALONG SAID EAST LINE OF CICERO AVENUE, A DISTANCE OF 19.00 FEET;
THENCE EAST ALONG A LINE 2633.50 FEET NORTH OF AND PARALLEL TO SAID "LINE A"
10.00 FEET; THENCE SOUTH PARALLEL TO SAID EAST LINE OF SOUTH CICERO AVENUE
21.00 FEET; THENCE EAST ALONG A LINE 2612.50 FEET NORTH OF AND PARALLEL TO
SAID "LINE A" A DISTANCE OF 2.40 FEET TO A POINT OF CURVE WHICH IS 8.40
FEET EAST OF SAID EAST LINE OF SOUTH CICERO AVENUE; THENCE ALONG A CURVED

FILED DATE: 8/20/2019 12:11 PM   2018L008190

FILED DATE: 8/20/2019 12:11 PM  2018L008190

## EXHIBIT C

LINE WITH A RADIUS OF 97.375 FEET AND CONCAVE TO THE NORTHWEST, A DISTANCE
OF 19.79 FEET TO A POINT OF TANGENCY; THENCE NORTHEASTERLY ALONG A STRAIGHT
LINE, WHICH MAKES AN ANGLE OF 35 DEGREES 00 MINUTES WITH THE LAST DESCRIBED
STRAIGHT LINE EXTENDED, A DISTANCE OF 73.13 FEET TO A POINT OF CURVE; THENCE
ALONG A CURVED LINE WITH A RADIUS OF 62.75 FEET AND CONCAVE TO THE SOUTHEAST
A DISTANCE OF 38.33 FEET TO A POINT OF TANGENCY WHICH POINT OF TANGENCY IS
2683.50 FEET NORTH OF SAID 'LINE A' AND 160.44 FEET EAST OF SAID EAST LINE
OF SOUTH CICERO AVENUE; THENCE EAST ALONG A LINE 2683.50 FEET NORTH OF AND
PARALLEL TO SAID 'LINE A' A DISTANCE OF 2263.56 FEET; THENCE SOUTH ALONG
SAID EAST LINE OF THE WEST 2430.00 FEET OF SECTION 27, A DISTANCE OF
2483.50 FEET TO THE POINT OF BEGINNING, (EXCEPT THAT PART THEREOF LYING
IN PARCEL 1), IN COOK COUNTY, ILLINOIS.

COOK COUNTY, ILLINOIS
FILED FOR RECORD

DEC 4 '78  3 06 PM

*24748418

SEE PLAT IN TRACT BOOK

2

EXHIBIT D

The South 30 feet of the North 283 feet of that part of
the North 3/4 of Section 27, Township 38 North, Range 13
East of the 3rd P.M. described as follows:

Beginning at the intersection of a line 2,506.00 feet East
of and parallel with the West line of said Section 27 and
a line hereinafter referred to as "Line A", which extends
East from a point on the West line of said Section 27 which
is 644.66 feet South from the Northwest corner of the South
1/2 of said Section 27 to a point on the East line of said
Section 27 which is 619.17 feet South from the Northeast
corner of said South 1/2;

thence East along said "Line A" 2,755.35 feet to a point in
the West line of S. Pulaski Road, as per Document No.
19963728, said West line of S. Pulaski Road being 70.00 feet
West of the East line of said Section 27;

thence South along said West line of S. Pulaski Road (said
West line being 70.00 feet West of and parallel to the East
line of said Section 27) a distance of 236.59 feet;

thence Southeasterly along a line a distance of 191.05 feet
to a point, said point being 50.00 feet West of said East
line of Section 27;

thence South along the West line of S. Pulaski Road (said
West line being 50.00 feet West of and parallel to the East
line of said Section 27) a distance of 31.15 feet to a corner
of the land heretofore dedicated for a public street by a
plat recorded in the Recorder's Office of Cook County,
Illinois, as Document No. 13112544, which corner is 251.92
feet, more or less, North from the South line of the North
1/2 of the South 1/2 of said Section 27;

thence Southwestwardly along a line of said land, so dedi-
cated, being the arc of a circle having a radius of 65 feet
and convex Southeasterly a distance of 94.42 feet to a
point which is 107.00 feet (measured perpendicularly) West
from said East line of Section 27 and 187.00 feet (measured
perpendicularly) North from said South line of the North
1/2 of the South 1/2 of Section 27;

thence Westwardly along a line of said land, so dedicated,
a distance of 716.02 feet to a point 120.00 feet (measured
parallel to the East line of said Section 27) North from
said South line of the North 1/2 of the South 1/2 of Section
27;

- page 1 of 2 -

thence South a distance of 120.00 feet to a point on said
South line of the North 1/2 of the South 1/2 which is 820.00
feet West from the Southeast corner of said North 1/2 of
the South 1/2 of Section 27;

thence West along said South line of the North 1/2 of Section
27 a distance of 1,983.26 feet to a line 2,506.00 feet East
of and parallel to the West line of said Section 27;

thence North along said line 2,506.00 feet East 700.55 feet
to the point of beginning, in Cook County, Illinois.

- page 2 of 2 -

## Exhibit B

FILED
8/20/2019 12:11 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L008190

6250123

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, LAW DIVISION**

FORD CITY REALTY LLC, FORD CITY CH
LLC, and FORD CITY NASSIM LLC,
Delaware limited liability companies, as
successors-in-interest to SFI Ford City-
Chicago LLC

                    Plaintiffs,

     v.

FORD CITY
CONDIMINIUM ASSOCIATION,
an Illinois not-for-profit corporation

                  Defendant.

No. 2018-L-008190
Calendar W
Judge Diane M. Shelley

**NOTICE OF FILING**

TO:    See Attached Certificate of Service

      PLEASE TAKE NOTICE that on August 20, 2019, Plaintiffs Ford City Realty LLC, Ford
City CH LLC, and Ford City Nassim LLC filed with the Clerk of the Circuit Court of Cook County,
Illinois, Plaintiffs' ***Second Amended Complaint for Declaratory Judgment and Related Relief***.

                    FORD CITY REALTY LLC, FORD CITY CH LLC,
                    FORD CITY NASSIM LLC

          By:    /s/ Brendan J. Gerdes
                    One of their attorneys

Timothy J. Patenode
Brendan J. Gerdes
Katten Muchin Rosenman LLP (Firm No. 41832)
525 West Monroe Ave
Chicago, IL 60601
312-902-5539
timothy.patenode@kattenlaw.com
brendan.gerdes@kattenlaw.com
*Attorneys for Ford City Realty LLC,*
*Ford City CH LLC, and Ford City Nassim LLC*

FILED DATE: 8/20/2019 12:11 PM   2018L008190

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the above *Notice of Filing*, and Plaintiffs'

*Second Amended Complaint for Declaratory Judgment and Related Relief*, were served upon

the Defendant's counsel of record by electronic mail on August 20, 2019 at the email address listed

below.

> Ebony Lucas
> The Property Law Group, LLC
> 641 E. Pershing Rd., Ste. E
> Chicago, IL 60653
> elucas@plgesq.com

By:   /s/ Brendan J. Gerdes
      One of their attorneys

Timothy J. Patenode
Brendan J. Gerdes
Katten Muchin Rosenman LLP (Firm No. 41832)
525 West Monroe Ave
Chicago, IL 60601
312-902-5539
timothy.patenode@kattenlaw.com
brendan.gerdes@kattenlaw.com
*Attorneys for Ford City Realty LLC,*
*Ford City CH LLC, and Ford City Nassim LLC*

FILED DATE: 8/20/2019 12:11 PM   2018L008190

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| FORD CITY REALTY LLC, FORD CITY CH LLC, and FORD CITY NASSIM LLC, Delaware limited liability companies, as successors-in-interest to SFI Ford City-Chicago LLC <br><br> Plaintiffs, <br><br> v. <br><br> FORD CITY CONDIMINIUM ASSOCIATION, an Illinois not-for-profit corporation <br><br> Defendant. | No. 2018-L-008190 <br> Calendar W <br> Judge Diane M. Shelley |

SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
AND RELATED RELIEF

Plaintiffs Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC (the "Ford City Purchasers"), by their attorneys, hereby complain of defendant Ford City Condominium Association (the "Association"), alleging as follows:

**Nature of Case**

1.     The Ford City Purchasers bring this action to remedy a long history of non-payment for water purchased by the Association. The Association failed to pay for approximately $395,000 worth of water supplied by SFI Ford City-Chicago LLC ("SFI"), the Ford City Purchasers' predecessor, since December 2012. Although in December 2015, the Association commenced a monthly installment plan intended to remedy the Association's arrearage, the Association defaulted on the plan many months ago. In Count I, the Ford City Purchasers seek a declaration that, like any other vendor, they are entitled to terminate water supply to the Association's property for non-payment; and they seek a money judgment against the Association for past-due amounts.

1

FILED DATE: 8/20/2019 12:11 PM   2018L008190

In Count II, the Ford City Purchasers seek an additional judgment for water charges the Association failed to pay the original property owner.

### Parties

2.      The Ford City Purchasers are three Illinois limited liability companies that own the Ford City shopping center in Chicago, Illinois as tenants-in-common.

3.      The Association is an Illinois not-for-profit corporation. Pursuant to the Declaration and By-Laws recorded as Document No. 24911808 with the Recorder of Deeds of Cook County, Illinois ("Declaration"), the Association acts as the governing body, as regards administration and operation, for all condominium unit owners in the Ford City Condominium, generally located at 4300 West Ford City Drive, Chicago, Illinois ("Property"). A copy of the Declaration without exhibits is attached as Exhibit A hereto.

### Facts of the Case

4.      In 1978, The Equitable Life Assurance Society of the United States ("Equitable") was the owner of the Ford City shopping center. In 1978, Equitable sold the Property to a land trust known as American National Bank and Trust Company of Chicago, as trustee under trust agreement dated October 20, 1978 and known as Trust No. 45058 ("ANB Trustee"). In 1979, ANB Trustee recorded the Declaration and established the Ford City Condominium.

5.      At the time of the 1978 sale of the Property to ANB Trust, a certain "Agreement" was executed between Equitable and ANB Trustee and recorded as Document No. 24748418 with the Recorder of Deeds of Cook County, Illinois. A copy of the Agreement is attached as Exhibit B hereto.

6.      The Agreement labeled certain property owned by Equitable as "Parcel I," and the Property to be sold to ANB Trustee as "Parcel II." The Agreement recited that Parcel II adjoined

2

FILED DATE: 8/20/2019 12:11 PM   2018L008190

and was contiguous with Parcel I, and that there were located on Parcel I and other property certain mains supplying water to the domestic water and fire protection systems of Parcel II.

7.      Article V of the Agreement recited that "All water currently used in Parcel II is purchased by Equitable from the City of Chicago, and is conveyed to Parcel II through pipes, lines and mains located in Parcel I and Parcel II," and that ANB Trustee "shall pay Equitable for all water consumed by tenants and owners in Parcel II."  (Ex. B, Article V, pp. 9-10.) A footnote to Article V states that:

> [I]n the event that [ANB] Trustee . . . shall file a declaration of condominium affecting Parcel II, Equitable's obligation hereunder to sell water for the use of tenants and owners of Parcel II shall cease and terminate; provided, however, that Equitable shall continue to sell water on the terms stated herein to any entity created by [ANB] Trustee for the purpose of purchasing water for the use of tenants and owners of Parcel II. In no event shall Equitable be obligated to sell water directly to individual condominium unit owners or individual apartment renters on Parcel II.

Exhibit B, Article V, p. 11.

8.      The original parties to the Agreement intended the covenants to run with the land.

Article V of the Agreement, "Supply of Water to Parcel II" provides that:

> Equitable hereby grants onto Trustee, *its successors and assigns* (a) the right to use existing water pipes, lines and mains and caps and installation connected therewith location in Parcel II and use the same for the purpose of conveying water into and throughout Parcel II, and for other uses benefitting Parcel II[.]

Exhibit B, Article V, p. 10 (emphasis added).

9.      The Agreement further provides that:

> To have, to hold and enjoy forever the rights granted hereunto to Trustee, *its successors and assigns and the future owner or owners of Parcel II*… Trustee *shall pay* Equitable for all water consumed by tenants and owners in Parcel II at the same rate which Equitable shall charge all other users…

Exhibit B, Section V, p. 10 (emphasis added).

FILED DATE: 8/20/2019 12:11 PM   2018L008190

10.     The Agreement made ANB Trustee's obligation to pay for water a covenant that ran with the Parcel II land and that affected the use, value and enjoyment of Parcel I.

11.     Equitable transferred title to Parcel I to a land trust held by LaSalle National Bank, later transferred to Chicago Title Land Trust Company, as trustee under a trust agreement dated March 1, 1987 and known as Trust No. 101496-07 ("CTLTC Trustee"). As of December 31, 1993, CTLTC Trustee and its beneficiary borrowed $114.5 million from Teachers Insurance and Annuity Association of America, secured by a mortgage on Parcel I. The lender's interest in that loan was ultimately assigned to SFI's affiliate.

12.     On or about May 1, 2012, that loan matured but was not repaid and went into default. On December 7, 2012, SFI's affiliate agreed with CTLTC Trustee, its beneficiary and guarantor to a deed-in-lieu of foreclosure, and SFI took title to Parcel I.

13.     On or about April 30, 2019, after the commencement of the instant action, a certain Bill of Sale was executed between SFI and the Ford City Purchasers, and a Special Warranty Deed was recorded as Document No. 1912313041 with the Recorder of Deeds of Cook County, Illinois. The Ford City Purchasers correspondingly became the successors to all real property interest and received an assignment of all interests, including any causes of action. Copies of the Bill of Sale without exhibits and the Special Warranty Deed are attached as <u>Exhibit E</u> and <u>Exhibit F</u> hereto.

## COUNT I

### (Declaratory Judgment and Related Relief Regarding Water Supplied Subsequent to December 7, 2012)

14.     The Ford City Purchasers reallege and incorporate Paragraphs 1 through 13 above, as though fully set forth herein.

15.     Since December 7, 2012 and pursuant to the Agreement, SFI supplied water to the Association, which was the entity created to purchase water for the use of the unit owners of the

FILED DATE: 8/20/2019 12:11 PM    2018L008190

Ford City Condominium. In accordance with the Agreement, SFI charged the Association for that water at the same rate that the City of Chicago charged SFI. Pursuant to the Agreement, the Association became obligated to pay for the water supplied.

16.    Subsequent to December 7, 2012 and as of January 28, 2019, the Association purchased worth of water from SFI $1,097,516.58. The Association has not paid for all of the water purchased from SFI since December 2012. The charges for the water supplied by SFI and the payments made by the Association for the period from December 7, 2012 through December 18, 2018, are included in SFI's Bill of Particulars No. 2, which is incorporated by reference.

17.    For several years after SFI took title to Parcel I, the Association's payments were irregular and insufficient to cover current charges with the result that the Association incurred a substantial and growing arrearage. In or about January 2016, representatives of SFI met with the Association's board to discuss payment for the water used by the Association. The Association commenced at that time to pay SFI installments of $17,000 a month and reduce the arrearage over time.

18.    Beginning in January 2016, the Association paid those $17,000 monthly installments until January 2018, when it began to fall behind. SFI accepted subsequent payments without waiver of its rights or claims. The Association has not caught up on the plan but left many months unpaid. In addition, since 2017, water charges have begun to equal or exceed $51,000 a quarter. Since December 7, 2012, the Association has paid water charges of only $702,000, leaving a balance as to the water supplied by SFI of $395,516.58, as of January 28, 2019.

19.    From and after January 28, 2019, SFI and the Ford City Purchasers have continued to supply water to the Association. While the Association has made certain payments since that date, they have not been enough to resolve all past due amounts.

20.     The 2016 installment plan was not binding on SFI or the Ford City Purchasers.

Alternatively, if it was binding, the Association is in material breach of the 2016 installment plan

and has no right to cure its breach or reinstate the plan. Nothing in the Agreement or the common

law requires the Ford City Purchasers to provide water to the Association without payment. The

Ford City Purchasers have a common law right to suspend further provision of water to the

Association for non-payment.

21.     An actual and justiciable controversy exists within the meaning of Section 2-701 of

the Illinois Code of Civil Procedure, and this Court is thereby empowered to declare the rights of

the parties regarding the provision of water to the Association.

22.     This Court should declare that the Ford City Purchasers are owed money for water

supplied and are entitled to suspend the further provision of water until the Association has paid

all arrearages.

23.     At the time of judgment, this Court should do an accounting of the arrearages still

owed by the Association and enter a money judgment against the Association in that amount.

24.     In the alternative, the Ford City Purchasers request that the Court appoint a water

receiver for the Association that is empowered (i) to assess all unit owners with the money

necessary to pay current water charges and to retire past due charges on a reasonable schedule, (ii)

to impose a lien on units for unpaid assessments and to enforce or foreclose such liens, and (iii) to

further assess the unit owners with the costs of administering the receivership and collecting

amounts assessed, including the attorney's fees and expenses incurred in the enforcement of water

liens.

WHEREFORE, Plaintiffs Ford City Realty LLC, Ford City CH LLC, and Ford City

Nassim LLC hereby request that this Court: (a) enter judgment in its favor and against Defendant

6

Ford City Condominium Association declaring that Plaintiffs Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC upon reasonable notice, not to exceed 10 days, are entitled to terminate all supply of water to the Association and Parcel II; (b) enter judgment against the Association in the amount of unpaid water supply since December 7, 2012; (c) alternatively, appoint a water receiver for the Association that is empowered (i) to assess all unit owners for the funds necessary to pay current water charges and to retire past due charges on a reasonable schedule, (ii) to impose a lien on units for unpaid assessments and to enforce or foreclose such liens, and (iii) to further assess the unit owners with the costs of administering the receivership and collecting amounts assessed, including the attorney's fees and expenses; and (d) grant such other relief as the Court deems just.

## COUNT II

### (Money Judgment For Water Supplied Prior to December 7, 2012)

25.     The Ford City Purchasers reallege and incorporate the allegations of Paragraph 1 through 24 as though fully set forth herein.

26.     The Association did not pay SFI's predecessor for all water supplied to the Association prior to December 7, 2012. The charges for the supply of water by SFI's predecessor and the payments received by the Association for the period prior to December 7, 2012 are included in SFI's Bill of Particulars No. 1, which is incorporated by reference.

27.     SFI took title to Parcel I on December 7, 2012 pursuant to the Deed-In-Lieu of Foreclosure Agreement. A copy of the Deed-In-Lieu of Foreclosure Agreement without exhibits is attached as Exhibit C hereto. Pursuant to that agreement, SFI received an Assignment, a copy of which is attached as Exhibit D hereto.

FILED DATE: 8/20/2019 12:11 PM   2018L008190

7

FILED DATE: 8/20/2019 12:11 PM  2018L008190

28.     The Ford City Purchasers took title to Parcel I on April 30, 2019 pursuant to the Special Warrant Deed, and received an assignment of all interests including any causes of action. Copies of the Special Warranty Deed and the Bill of Sale without exhibits are attached as <u>Exhibit F</u> and <u>Exhibit E</u> hereto.

29.     By operation of law, the transfer of real property title to the Ford City Purchasers conveyed to the Ford City Purchasers the right to recover from the Association the past-due water charges pursuant to the Agreement. In addition, the Special Warranty Deed and the assignment conveyed to the Ford City Purchasers the right to recover from the Association the past-due water charges.

30.     The Association's arrearage for the period prior to December 7, 2012, is $542,440.02. This Court should enter judgment in favor of the Ford City Purchasers and against the Association in that amount.

WHEREFORE, Plaintiffs Ford City Realty LLC, Ford City CH LLC, and Ford City Nassim LLC hereby request that this Court enter judgment in its favor and against Defendant Ford City Condominium Association in the amount of $542,440.02 for the unpaid water supply prior to December 7, 2012, and to grant such other relief as this Court deems just.

Dated: August 20, 2019                     FORD CITY REALTY LLC, FORD CITY CH LLC,
                                           FORD CITY NASSIM LLC

                                       By:    /s/ Timothy J. Patenode
                                              One of their attorneys

Timothy J. Patenode
Brendan J. Gerdes
Katten Muchin Rosenman LLP (Firm No. 41832)
525 West Monroe Ave
Chicago, IL 60601
312-902-5539
timothy.patenode@kattenlaw.com
brendan.gerdes@kattenlaw.com