## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| FORD CITY CONDOMINIUM ASSOCIATION, | ) | (Subchapter V) |
| | ) | |
| Debtor. | ) | Case No. 21-05193 |
| | ) | |
| | ) | Hon. Deborah L. Thorne |
| | ) | |

## PLAN OF REORGANIZATION OF FORD CITY CONDOMINIUM ASSOCIATION AND SUPPORTED BY SUBCHAPTER V TRUSTEE DATED SEPTEMBER 10, 2024

**CRANE, SIMON, CLAR & GOODMAN**
Scott R. Clar
135 S. LaSalle Street
Suite 3950
Chicago, Illinois 60603
(312) 641-6777
 sclar@cranesimon.com
*Counsel for the Debtor*


And Supported By:

**SMITH, GAMBRELL & RUSSELL LLP**
Shelly A. DeRousse
Adam C. Toosley
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312)360-6000
sderousse@sgrlaw.com
atoosley@sgrlaw.com
*Counsel for William B. Avellone, as Subchapter V Trustee in Possession*

# TABLE OF CONTENTS

Page

ARTICLE I INTRODUCTION, DISCLOSURES, DEFINITIONS, INTERPRETATION
AND EXHIBITS……………………………………………………………………..1

    Section 1.01   Introduction……………………………………………………………..1

    Section 1.02   Disclosures……………………………………………………………...1

    Section 1.03   Background of Subchapter V Case…………………………………………..2

    Section 1.04   Definitions……………………………………………………………..11

    Section 1.05   Rules of Interpretation and Computation of Time………………………..16

    Section 1.06   Exhibits………………………………………………………………..16

ARTICLE II UNCLASSIFIED CLAIMS…………………………………………………16

    Section 2.01   Unclassified Claims……………………………………………………...16

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS………………………….16

    Section 3.01   Classified Claims………………………………………………………...16

ARTICLE IV VOTING AND IMPAIRMENT OF CLASSES……………………………………17

    Section 4.01   Impaired Classes of Claims Entitled to Vote……………………………17

    Section 4.02   Classes Deemed to Accept the Plan……………………………………...17

    Section 4.03   Classes Deemed to Reject the Plan………………………………………17

    Section 4.04   Voting and Confirmation Procedures…………………………………….17

    Section 4.05   Confirmation Hearing…………………………………………………..18

    Section 4.06   Cram Down……………………………………………………………..18

    Section 4.07   Fair and Equitable Test…………………………………………………..18

    Section 4.08   Best Interest Test………………………………………………………..20

ARTICLE V TREATMENT OF CLASSES OF CLAIMS AND INTERESTS………………...20

    Section 5.01   Allowed Professional Fee Claims………………………………………..21

    Section 5.02   Allowed Other Administrative Expense Claims…………………………21

Section 5.03   Payments to Classes and Timing……………………………………...21

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND LEASES……………..22

Section 6.01   Executory Contracts Assumed or Deemed Rejected……………………22

Section 6.02   Bar Date for Rejection Damages…………………………………………...23

ARTICLE VII MEANS OF IMPLEMENTATION OF THE PLAN…………………………….23

Section 7.01   Simultaneous Service of Subchapter V Trustee and Receiver…………...23

Section 7.02   Property Sale and Liquidating Trust……………………………………24

Section 7.03   Special Assessment…………………………………………………….24

Section 7.04   Plan Payments………………………………………….…………...25

Section 7.05   Transfer of Causes of Action……...……………………………………26

Section 7.06   Funding…………………………………………………………………26

Section 7.07   Management………………………………………………………….26

Section 7.08   Continued Corporate Existence Between the Confirmation Date and the
Effective Date…………………………………………………………………....26

Section 7.09   Objections to Claims……………………………………………………26

Section 7.10   No Distribution on Disputed Claims……………………...…………...27

Section 7.11   Section 1146 Exemption…………..……………………………………27

Section 7.12   Documentation Necessary to Release Liens…………………………….27

Section 7.13   Appropriate Remedies……………………………………………...27

Section 7.14   Disbursing Agent and Distribution Record Date…………………………27

Section 7.15   Avoidance Actions..…………………………………………………..28

Section 7.16   The Litigation Trust……………………………………………………28

Section 7.17   Liquidating Trustee/Post-Confirmation Management…………………..28

ARTICLE VIII BAR DATES FOR ADMINISTRATIVE CLAIMS, PRIORITY
CLAIMS AND GENERAL UNSECURED CLAIMS…………………………………28

Section 8.01   Bar Date for Administrative Claims…………………………………28

Section 8.02   Bar Date for Priority and General Unsecured Claims……………………...29

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE……………..29

Section 9.01   Conditions to Confirmation…………………………………………………...29

Section 9.02   Conditions to Effective Date………………………………………………29

ARTICLE X EFFECTS OF CONFIRMATION…………………………………………………...31

Section 10.01  Debtors' Discharge…………………………………………………………31

Section 10.02  Injunction…………………………………………………………………...31

Section 10.03  Term of Bankruptcy Injunction or Stays…………………………………...32

Section 10.04  Exculpation…………………………………………………………………32

Section 10.05  Other Documents and Actions……………………………………………...32

Section 10.06  Powers of Circuit Court of Cook County…………………………………32

Section 10.07  Power of Unit Owners……………………………………………………...32

ARTICLE XI MISCELLANEOUS PROVISIONS……………………………………………...33

Section 11.01  Headings for Convenience Only.......………………………………………...33

Section 11.02  Binding Effect of Plan………………………………………………………...33

Section 11.03  Modification of the Plan……………………………………………………33

Section 11.04  Final Order……………………………………………………………………33

Section 11.05  Severability……………………………………………………………………33

Section 11.06  Governing Law………………………………………………………………34

Section 11.07  Notices………………………………………………………………………...34

Section 11.08  Filing of Additional Documents……………………………………………35

Section 11.09  Lapsed Distributions………………………………………………………35

Section 11.10  Undeliverable and Unclaimed Distributions……………………………35

Section 11.11  Defenses with Respect to Claims…………………………………………...35

Section 11.12  No Injunctive Relief…………………………………………………………36

Section 11.13  No Admissions…………………………………………………………...36

Section 11.14  Written Agreement…………………………………………………………36

Section 11.15  Minimal Distribution………………………………………………………36

ARTICLE XII RETENTION OF JURISDICTION…………………………………………..36

Section 12.01  Exclusive Jurisdiction of Bankruptcy Court……………………………..36

# ARTICLE I

## INTRODUCTION, DISCLOSURES, DEFINITIONS, INTERPRETATION AND EXHIBITS

Section 1.01    <u>Introduction</u>

The Debtor, with support from the Subchapter V Trustee, proposes this Subchapter V Plan dated September 10, 2024, under sections 1129 and 1191 of chapter 11 of the Bankruptcy Code. This Plan under chapter 11 of the Bankruptcy Code proposes to pay creditors of the Debtor from funds to be received as a result of a deconversion and sale of the Property either through a Voluntary Sale or a Receiver Sale, as explained herein.

The Debtor and the Subchapter V Trustee believe that confirmation of the Plan is in the best interest of all parties, including the Debtor's Creditors and Estate.  Accordingly, the Debtor and Subchapter V Trustee urge each Creditor that is Impaired hereunder, and entitled to vote, to vote to accept the Plan.

The Debtor is a not-for-profit organization operating as a condominium association whose main assets are the accounts receivable for unpaid fees and assessment owed to the Debtor by the owners of condominium units.  The City of Chicago has filed an action for deconversion of the condominium Property, in which proceeding the City is seeking a court order declaring that the Property is no longer a condominium and providing for the ultimate sale of the Property as a whole. The Debtor has statutory filed and inchoate liens against the individual condominium units for the unpaid fees and assessments, the amount of which continues to grow.  This Plan is contingent upon a Voluntary Sale or a Receiver Sale with the judge in the Circuit Court of Cook County, Illinois entering orders granting the City's requested relief in the deconversion action, providing for the deconversion of the Property and the authority to sell the Property and any ancillary requests such as an order approving the sale of the Property, and approving the payment of the outstanding fees and assessments owed to the Debtor to the Creditors and holders of Administrative Claims directly at closing, or, in the alternative, to a Liquidating Trust which will be established to effectuate this Plan.

Section 1.02    <u>Disclosures</u>

The Debtor submits this Subchapter V Plan of Reorganization and asserts that it contains adequate information pursuant to sections 1125(f) and 1187(c).

To be counted, a ballot containing your vote to accept or to reject the Plan must be received by the Clerk of the Bankruptcy Court by no later than 5:00 p.m. Central Standard Time on October 9, 2024.

**NOTICE TO UNIT OWNERS.   Because of the nature and treatment of your Claim or Interest under the Plan and the United States Bankruptcy Code, you are not entitled to vote on the Plan, because, as a Unit Owner who holds the equity in the Debtor, your equity interest in the Debtor will not be cancelled by the Plan and you will retain the same equity rights you have outside of the bankruptcy process under applicable law.**

NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS PLAN.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN THIS PLAN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. HOWEVER, THE DATA IN THE DEBTOR'S POSSESSION IS BASED ON THE RECORDS OF THE DEBTOR. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN TAKEN TO MAKE SURE IT FAIRLY REPRESENTS THE CURRENT POSITION OF THE DEBTOR.  CREDITORS ARE URGED TO CONSULT WITH THEIR OWN INDIVIDUAL COUNSEL OR EACH OTHER AND TO REVIEW ALL OF THE RECORDS HEREIN IN ORDER TO FULLY UNDERSTAND THE DISCLOSURES MADE IN THIS PLAN. ANY PLAN WILL BE COMPLEX, ESPECIALLY SINCE IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND ANY INTELLIGENT JUDGMENT CONCERNING EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT ITS COUNSEL WITH RESPECT TO THE PLAN, ITS TAX IMPLICATION(S) AND ITS EFFECT ON HIS, HER OR ITS RIGHTS.

Section 1.03    Background of Subchapter V Case

The Debtor is an Illinois not-for-profit corporation located at 4300 W. Ford City Drive, Chicago, Illinois 60652.  The Debtor exists and operates as a condominium association under the Illinois Condominium Property Act, 765 ILCS 605/1, *et seq*. for the Ford City Condominiums adjacent to the Ford City Mall in Chicago.  The Debtor manages the common elements in and around seven residential buildings with a total of 319 dwelling units and the associated real property on which the buildings sit, including over 13 acres (573,027 sq. feet) commonly referred to as 4260-4350 W. Ford City Drive, Chicago, Illinois (the "Property").

### *Description and History of the Debtor's Business*

### *History of the Condominium Buildings*

The Ford City Condominiums were originally built in 1968 and named the "Ford City Village" apartments.  In 1961, Harry F. Chaddick led a group of investors to purchase the previous Ford Motor plant site and developed the Ford City Mall.  The Ford City Mall was first opened in 1965, and then in 1968 the Ford City Village apartments were developed.  The property site was formerly used as a World War II B-29 engine plant, a Tucker automotive assembly plant, then a Ford Motor plant.

When constructed in 1968, the project was comprised of seven apartment buildings, 319 residential apartment units, and a garage with 38 parking spots and additional parking lots. The seven buildings consist of four five-story buildings (buildings B1, B2, C1, and C2), two two-story buildings (buildings D1 and D2), and one 15-story building (building A1). These buildings are located from 4260-4350 W. Ford City Drive and 4261-4351 W. 76th Street.

2

### History of the Debtor

The Ford City Village apartments were purchased in 1979 by Astor Investments.  Astor subsequently converted the apartments into condominiums.  The condo units were selling from the mid $20,000 to mid $30,000 range.  The completed conversion project was reported to have cost between $16-20 million dollars.

The Debtor was established pursuant to a certain Declaration of Condominium Ownership and of Easements, Restrictions, Covenants and By-Laws for Ford City Condominium, filed in the Office of the Recorder of Deeds of Cook County, Illinois on April 9, 1979 (the "Declaration"). The Declaration was amended on a few occasions.

Currently, out of the 319 total condominium units, approximately 65% are owner-occupied, 30% are rented to tenants, and 5% are vacant.

The Debtor has been in a difficult financial condition for many years.  In 2018, the outside property manager resigned, leaving the Debtor to be self-managed by the owners.  A history of unpaid assessments and lack of capital reserves has led to under-funding of operating costs and a serious under-investment in capital repairs.

Additionally, while the Debtor was established as a separate entity from the Ford City Mall (the "Mall"), it continues to receive its water supply from the Mall, which in turn receives its water supply from the City of Chicago. The City of Chicago bills only the Mall for the water used by both the Mall and the Debtor. The Mall and the Debtor have a contract for the Debtor to pay the Mall its share of the water bills. Due to financial difficulties as provided below the Debtor has not been able stay current on its obligations to pay the Mall its portion of the water bills and there is a significant prepetition and post-petition arrearage owed to the Mall.

Mounting unpaid bills, including water bills, poor record keeping and accounting practices, decaying building systems, plus mismanagement, eventually led to the Debtor filing a petition for voluntary bankruptcy under subchapter V of the Bankruptcy Code on April 20, 2021. The Trustee, William Avellone, was appointed as the subchapter V trustee and, as a result of alleged pre-petition mismanagement by the Board, on September 2, 2021, the Bankruptcy Court ordered that the Board be removed from control and the Trustee was appointed to perform the duties of a debtor-in-possession under the Bankruptcy Code.

### New Professional Property Manager

When the Trustee took control of the Debtor's affairs, one of his first tasks was to solicit interest from experienced property managers.  After an evaluation of proposals, the Trustee selected Farbman Group of Chicago, LLC f/k/a Foresite Realty Management, LLC.  Currently the property manager's staff includes one person located in an onsite association office, an onsite maintenance engineer, plus off-site accounting and management support.

When the Trustee and the property manager took over the management of the Debtor, there were no financial records to be found and they were told that the financial books and records were taken by members of the previous board.  Similarly, the computers with financial records were taken by previous board members.  The Trustee and property manager could find only limited

3

written or digital records of accounts payables or receivable and records of owner assessments. Along those same lines, there were reports of board members taking cash payments from unit owners with no records or receipts.

Additionally, tax returns had not been filed for three years. On the date of bankruptcy filing, the filing with the Illinois Secretary of State was not current, either. When the Trustee took over management of the Debtor, tax returns had not been filed for three years. The Trustee filed tax returns for 2021, 2022, and 2023.

*New Financial Controls*

Previous accounting and bookkeeping records were limited or non-existing (as outlined above), and frequent cash transactions were not being recorded. The Trustee has instituted new financial controls including:

- New bank accounts;

- Computerized accounting records;

- Elimination of all cash transactions; and

- Competitive bidding for service contracts.

*Health and Safety*

When the Trustee took over the affairs of the Debtor, there were multiple unaddressed health and safety problems, including city code violations. Many of these either have been or are currently being addressed, including: falling building façade, plumbing leaks, elevator malfunctions, sewer backups and flooding, electrical issues, faulty fire alarms, and limited posting of notices. The Trustee also addressed safety issues and parking lot maintenance. However, limited financial resources have restricted the extent to which many issues can be addressed and have forced the Trustee to prioritize urgent health and safety issues over necessary long term preventative maintenance. During the last three years, even with the limited funds available, new washers and dryers were installed and more than $477,687 has been spent on major repairs to the buildings including repairs to the elevators, plumbing/sewers, roofs, doors and security. These repairs are outlined in the chart below:

| | YTD 2024 (through June) | 2023 | 2022 |
|---|---|---|---|
| Elevators | $38,410 | $61,374 | $116,651 |
| Roofs | $473 | $9,673 | $1,183 |
| Plumbing | $52,172 | $79,914 | $73,251 |
| HVAC | | | $4,285 |
| Fire Alarm | $949 | $2,441 | $1,239 |
| Parking Lot | | $281 | $5,700 |
| Common Area | $10,996 | $9,450 | $9,245 |
| **TOTAL** | **$103,000** | **$163,133** | **$211,554** |

### New Board Elected by Unit Owners/Budgets

After the Trustee took control of the Debtor's affairs, one of his first tasks was to conduct a proper Board election for the first time in years. In the Fall of 2021, an election was scheduled, but because 20% of the Unit Owners failed to participate, a quorum was not reached, and an election could not take place.  It was not until March 2022 that the quorum was met, twelve new directors were elected to serve on the Board and the Board held its first meeting in April 2022. An election took place again in April 2023.

The draft 2022 budget was circulated to the Board on July 8, 2022 without any budget increases because the Board was set mid-year as a result of the failure to obtain a quorum at the Fall 2021 meeting. The draft 2023 budget was circulated to the Board on October 7, 2022.  The Board requested that the 2023 budget not include any additional assessment increase due to a fear that additional Unit Owners would not, or could not, pay, driving up collections even further.  The 2023 budget was adopted by the Board on January 26, 2023 and circulated to the Unit Owners in April 2023 after the Board was elected in April 2023.  The newly-elected Board then chose not to adopt the 2023 budget, and continued to operate under the 2022 budget. A new Board was then elected on June 20, 2024.

A budget for 2024 was provided to the Board.  As of the date of this Plan, the Board has not met to initially discuss the 2024 budget and continues to operate under the 2022 budget, which is insufficient to cover ongoing maintenance expenses.

### Legal, Maintenance, and Financial Issues Currently Impacting the Debtor

The Debtor is still facing a number of critical financial issues that make the likelihood of repairing and maintaining the properties to even the most basic level of safety and habitability impossible.

The Debtor's total yearly assessment base is $1,378,196 for all units and parking spaces. However, only approximately 70% of Unit Owners are actually paying their monthly assessments. The Debtor's assets are limited other than the assessments, as it owns no real property and its personal property assets are of little value.

There are some operating expenses, including the water assessment, that are being accrued and unpaid due to lack of funds.  The Trustee is commencing litigation to pursue remedies against the non-paying Unit Owners, but net recoveries to the Debtor are not expected to have a substantial impact on the Debtor's finances as outlined below.

Most critically, there are significant repairs to be made on the buildings to bring it up to code. G3 Construction Group was engaged to inspect the properties and give an opinion as to needed repairs. G3 concluded that many components of the buildings are nearing the end of their useful life with significant amount of capital needed to cure deferred maintenance. G3 broke the project into three categories:

|  | Amount | Per Unit |
|---|---|---|
| Critical Repairs | $16,818,415 | $52,558 |
| High Priority Repairs | $15,792,544 | $49,352 |
| Recommended Repairs | $2,958,952 | $9,247 |
| **Total** | **$35,569,911** | **$111,156** |

### MAJOR REPAIR ITEMS

- **Facade Repairs & Replace PTAC Units ($8.115MM est.) –** Gemini Associates provides quarterly reports as required by the City of Chicago. Although some repairs have been completed over time, significant work is still needed to keep the façade from further deteriorating.

- **Roof Repairs / Replacement ($1.183MM est.) –** Most of the roofs are coming up on their effective useful life and should be replaced in the next 0 – 5 years. Onsite engineer noted that roof leaks are a common occurrence in all of the buildings.

- **Repair lifted slab on grade concrete ($5.18MM est.) –** All seven buildings have foundation issues that are causing floors to buckle and causing further damage to the structural integrity of the buildings.

- **Replace exterior windows ($1.95MM est.) –** Windows are original and are beyond their effective useful life of approximately 40 years.

- **Replace plumbing riser, waste, vent & underground piping ($10.205MM est.) –** Plumbing systems are at the end of their effective useful life, hence a lot of the inefficiency plumbing issues throughout the complex.

As is evident from these numbers, the per unit cost of just *critical* repairs is higher than the average going-sale price of the units and the per unit cost of all repairs is two to three times higher than the average going-sale price.

In terms of other debt, the Debtor owes accrued tax liabilities due to the prior Board's failure to withhold or remit payroll taxes, more than $200,000 to Total Masonry for providing masonry and concrete repair work on the common elements of the Debtor's condominium buildings, and as of the petition date, the Debtor owed approximately $1.5 million in unpaid water bills from the Ford City Mall who was and is still purchasing the water from the City of Chicago and has sought reimbursement from the Debtor.

Additionally, the Debtor continues to incur substantial legal fees and fines resulting from the many pending building code violations. The fines incurred by the Debtor range from elevator violations in multiple buildings, garbage and trash on the Property, defective smoke detectors, water damage, and defective doors. Some of these violations have been cured but some still plague the Debtor to this day. Every dollar that is spent on legal fees to appear in court and paying fines is a dollar the Trustee does not have to perform critical repairs and maintenance to the properties.

### *Collections*

There is no "fast" mechanism for collecting on the outstanding balance owed by Unit Owners. After performing additional investigation, many of the delinquent owners are not paying taxes or mortgages and are in current foreclosure. In that situation, the Debtor always falls behind the taxing body and the lender in priority of payment, and unless a third-party bids at a foreclosure sale above what the lender bids, there are no excess funds to pay the Debtor and the lien for the nonpayment of assessments is extinguished. That would leave only the collection process of attempting to locate the Unit Owner, filing a lawsuit, getting a judgment and trying to find assets other than the condominium in order to collect. All these things cost money as outlined below. An example of this is found with Unit C1-206. This unit is listed as an open account in the amount of $46,676.77. However, a tax buyer purchased the unit in 2021 and is not liable for the pre-existing assessment liability. Therefore, the Debtor would be limited to a breach of contract action against a Unit Owner who recently lost his or her unit due to unpaid taxes. This is an example of an overstated amount on the chart of outstanding assessment liabilities as it does not appear to be collectable and any money spent attempting to collect would probably be simply lost. Similarly, for Unit C1-204, which shows a $29,508.44 balance, a tax deed was recorded in late May 2023 and that would foreclose out the Debtor's lien and the tax buyer is not responsible for the pre-existing balance. One final and similar example is with C1-504. This unit shows a current balance of $13,463.85. However, on September 20, 2023, the lender recorded a judicial sales deed in its favor, which, as was the case with the other two units, extinguished the Debtor's lien.

Another example of collection difficulty is found with Unit B2-208. On the chart of accounts receivable, it was listed as $82,759.52, but the owner showing on the Cook County Clerk's website is a South Carolina limited liability company whose authority to conduct business in Illinois was revoked in 2020.

In most normal real estate transactions, the Debtor is paid at the time that a unit sells. That is because, in Illinois, a condominium association has an automatic lien for outstanding dues. However, there have been multiple transactions performed outside the normal channels (through a title company) by individuals and companies buying up units inexpensively. Technically, these buyers will take the condominium subject to the Debtor's lien, but the process to obtain funds from them is not cheap, quick or easy.

For collection purposes, there are generally three or four options for an association. The first is to send a demand letter to the delinquent owner(s). This will get some Unit Owners to pay, and the Trustee has had success with some just by having an attorney send the demand letter. However, as many of the delinquent units are not owner-occupied, just locating the Unit Owner is a difficult task in many instances.

The second is to move for an eviction under Illinois' Condominium Property Act. Right now, the process is taking many months and thousands of dollars (the filing/service fee nears $500 alone) because most of the time, the record title owner of the unit cannot be located. In an eviction suit, the Debtor obtains possession and then can rent out the unit to pay down/off the assessment balance. Another issue with evictions is that the Debtor does not know the condition of the units. It may end up with a possession order for a unit that requires significant work to get it to a point where it can be rented. The Trustee has filed a few evictions where the Unit Owner, after getting

served, entered into payment plans, so that has been relatively successful considering the extreme delays in Cook County with the completion of the eviction process.

The Debtor can also record a lien and file a lien foreclosure lawsuit to take title. This process will easily take over a year and will cost thousands of dollars due to the fact that the process needs to play out in the courts, involves 2 publication expenses and a sheriff's sale. Then, even if the process is successful, the Debtor takes title to the unit subject to all other liens, including mortgages, unpaid taxes and liens. This remedy is typically only viable if the Debtor knows the condition of the unit and there is significant equity in the unit.

The final way to collect is to file a lawsuit for money damages against the Unit Owner. This process is theoretically the quickest/easiest way to go assuming that the Unit Owner does not contest the suit. If the case is under $30,000, it will be filed in the Municipal District and those Case move relatively quickly. But, again, if the Unit Owner cannot be located, the process will drag out, and that does not even take into account whether there are any assets to go after. Getting a judgment and collecting on a judgment are two very different things.

Under Illinois law, a condominium association has a lien on the units that owe assessments without the necessity to file an actual lien. It is anticipated that under any sale of the Property, as outlined in this plan, that the Debtor will be paid some amount of its lien(s) on a unit by unit basis, and the funds obtained will be used towards the payment of the Debtor's creditors. In order to accomplish this task, it is anticipated that a special or additional assessment, which will become due and owing before the sale of units that comprise the Debtor will be necessary.

### *Current Board/1129(a)(5) Disclosures*

As it currently stands, the Board of the Debtor is made up of the following individuals: Diane Devroe, Leticia Gamboa, Sherri Castile, Takada Dixon Epps, Diana Taylor Williams, Mohammednajib Alkaraki, George Polymenakos, Joanna Stallworth-Lillybridge, Terry Densmore, Joyce Martin, Alma Meza, and Nellie Cotton. The Officers of the Debtor are: Leticia Gamboa, Diana Taylor Williams, and Sherri Castile.

### *Significant Events in the Bankruptcy Case*

The voluntary Chapter 11 petition was filed on April 20, 2021 and the Subchapter V Trustee was appointed on April 21, 2021. On June 17, 2021, the Bankruptcy Court granted separate applications to employ Crane, Simon, Clar & Goodman and Shanita Straw for the Debtor. On September 2, 2021, the Debtor was removed as a debtor-in-possession on motion filed by the United States Trustee.

On September 10, 2021, the Bankruptcy Court granted the application to employ the undersigned counsel for the Subchapter V Trustee. On September 14, 2021, the Bankruptcy Court granted the application filed by the Subchapter V Trustee to employ Foresite Realty Management LLC as property manager. Foresite Realty Management LLC is now known as Farbman Group of Chicago, LLC and the Bankruptcy Court approved that change on March 10, 2022.

Three adversary proceedings have been filed in this case. On August 27, 2021, an adversary complaint was filed against The Property Law Group, LLC by the Subchapter V Trustee.

On July 21, 2022, summary judgment was granted in favor of the Trustee and against The Property Law Group, LLC is the amount of $25,125.00.

On April 19, 2023, an adversary complaint was filed against former board members of the Debtor and the directors and officers' insurer, United States Liability Insurance Company. The basis of the claim was that certain of the Debtor's former officers and board members committed breaches of fiduciary duty, mismanagement, and other acts, errors, omissions, misstatements, misleading statements, neglect and breaches of duty under Illinois law and the Debtor's bylaws. On August 31, 2023, the Bankruptcy Court granted the Motion to Dismiss filed by United States Liability Insurance Company. That decision is currently being appealed to the District Court and the remainder of the adversary case has been stayed by order of the Bankruptcy Court dated October 18, 2023.

On July 13, 2023, the City of Chicago filed an adversary proceeding for deconversion of the condominiums. On August 31, 2023, the Bankruptcy Court entered an order abstaining from presiding over the action, instead instructing and authorizing the City of Chicago to adjudicate that action in the Circuit Court of Cook County, Illinois.

After the Petition Date, and after his appointment, the Subchapter V Trustee has continued to operate Debtor's business as a debtor in possession under the Bankruptcy Code. Pursuant to the Bankruptcy Code, the Debtor is required to comply with certain statutory reporting requirements, including the filing of monthly operating reports. The Debtor is current on all filing requirements.

### *Post-Petition Restructuring Efforts*

Due to the mounting debt and significant deferred maintenance, a few options have been explored related to the possible restructuring of the Debtor. If an association is faced with significant expenses that it cannot pay (like the Debtor), one option that is available is a voluntary deconversion or bulk sale of the condominium. This process basically turns the condominium units into apartments owned by a third-party. However, in the City of Chicago, eight-five percent (85%) of the Unit Owners, by percentage ownership interest, must affirmatively agree to move forward with sale of the entire condominium. The sale proceeds are distributed to each owner per their percentage ownership interest in the condominium, and will be used to extinguish all existing liens against the owner's interest in the condominium unit, with the net proceeds after liens have been paid to be distributed to each owner similar to a standard sale.

Another option is to locate a lender who will pay off the Debtor's debt and provide funds to correct the ongoing problems at the condominium property. However, the only collateral that could be pledged for such a loan are the accounts receivable. Since the total amount that would be needed by the Debtor to get the Property into compliance is exorbitant and exceeds the value of the accounts receivable, this is not a realistic option.

A third option exists under Section 14.5 of the Illinois Condominium Act (765 ILCS 605/14.5). This provision allows a municipality, here the City of Chicago, to commence a proceeding where a court may deem the condominium a distressed property and mandate the sale of the entire Property through a court-appointed receiver. There are specific elements that must be proven by the City of Chicago, and if successfully proven, the court may then deem the Property

no longer a condominium, and that any liens affecting any unit shall attach to the interest of the unit owner in the Property.

The City of Chicago distressed property procedure may also allow a receiver to enter into a sales contract and transfer title to the condominium on behalf of the Unit Owners.  In that situation, the net proceeds of the sale, after payment of all the receiver's costs, time, expenses, and fees as approved by the court, shall be deposited into an escrow account.  Proceeds in the escrow account shall be segregated into the respective shares of each Unit Owner and are distributed in the following order: (1) to pay taxes attributable to the Unit Owner; then (2) to pay other liens attributable to the Unit Owner, including all mortgages and the Debtor's statutory liens for unpaid assessments; and then (3) to pay each Unit Owner any remaining sums from his or her respective share.  The process is monitored by the judge handling the case and the Debtor's involvement will be solicited.  Ultimately, the judge chooses what offer is best and the amount that each unit owes for taxes and other liens will have to be analyzed as of the time of the distribution.  For all of these reasons, the timing and amount of any distribution to each Unit Owner is unknown in this scenario (a distressed condominium sale by a receiver).

A receiver appointed in a City of Chicago distressed property procedure can operate, manage and conserve the property during the pendency of the case.  That receiver can do many of the tasks that the Board is tasked with doing, including secure and clean the property, secure tenants, collect rents and assessments, insure the property, employ third-parties, pay taxes, maintain utilities, make repairs, etc.

On September 8, 2023, the City of Chicago has filed the City of Chicago Case seeking to have the condominium deemed distressed, Case No. 2023-M1-401241 The City of Chicago has also moved to deconvert the Property pursuant to 765 ILCS 605/14.5, and that motion, which includes a request for a receiver to be appointed, has been continued multiple times including to September 16, 2024 at 10:30 a.m.  The Bankruptcy Court has abstained and the Circuit Court of Cook County has the jurisdiction to proceed with the City of Chicago Case, provided that the statutory liens of the Debtor against the sale proceeds attributable to liens resulting from unpaid assessments, fines and other charges will be enforced and the proceeds of such liens will be distributed in accordance with this Plan.

The Subchapter V Trustee, along with the assistance of the property manager, has solicited potential purchasers of the property for a Voluntary Sale or for a potential sale from a court-appointed receiver in the City of Chicago Case.  The chart attached as **Exhibit 1** outlines the terms of initial potential offers from investors known to the Trustee.  It is anticipated that this information will be passed along to the court-appointed receiver in the City of Chicago Case.

### *The Debtor's Post-Confirmation Restructuring*

Post-confirmation, the Debtor will continue to collect assessments and rents and pay expenses related to the common elements pending a sale through a receiver appointed in the City of Chicago Case.  It is anticipated that the Debtor will work with any buyer and will obtain payment on its liens against the individual units in the Property.  The amount of these payments is difficult to know at this point, as a full analysis will need to be done on a unit-by-unit basis as to the amount of mortgage and tax debt (which will be paid first) along with any other recorded liens

on the unit(s).  A special or additional assessment of all units will need to be issued by the Debtor to cover the administrative expenses and the claims asserted by the creditors in this case.  The special or additional assessment will be set so that it is due and owing only in advance of a receiver sale through the City of Chicago case so that the right of the Debtor to obtain the funds out of the proceeds is properly perfected. The continued assessments and rents obtained by the Debtor along with the funds received on behalf of its lien from any sale of the Property is hereby referred to as the "Fees Payment."

### The Debtor's Assets and Liabilities

1. Assets.   The Debtor's assets include a limited amount of cash, approximately $2.35 million in accounts receivable (not 100% collectible), furniture and equipment with nominal value, and a cause of action against its former Board members.   The accounts receivable will increase as part of this Plan, due to the imposition of a Special Assessment to cover post-petition water and maintenance costs of the Property.

a. Common Elements and Personal Property. The Debtor is responsible for the maintenance of the common elements in the buildings and on the Property.   These common elements are not owned by the Debtor.  The Debtor owns some office furniture.  The valuation of the physical assets is speculative as part of the Debtor's ongoing operations and would have a *de minimus* liquidation value.

b. Real Property. The Debtor owns no real property.  The condominium unit owners own pro rata shares of the Property which the Debtor manages.

c. Causes of Action. The Debtor anticipates (1) continuing its pursuit of the appeal resulting from the granting of the motion to dismiss in the case against the insurance company, as discussed *supra*, (2) depending on the ruling of the appeal, prosecuting the case against the insurance company and the former Board of the Debtor as discussed *supra*, and (3) pursuing outstanding collection against the unit owners within the Debtor.

Section 1.04   Definitions.

"Administrative Claim" means a Claim of a Creditor of the kind specified in section 503(b) of the Bankruptcy Code that is entitled to priority under section 507(a)(2) of the Bankruptcy Code, and includes: (i) actual and necessary costs and expenses incurred by a Debtor after such Debtor's Petition Date with respect to preserving such Debtor's Estate and operating the Debtor's business; (ii) any Professional Fee Claims approved by the Bankruptcy Court under section 330 of the Bankruptcy Code that are incurred on or before the Confirmation Date; and (iii) all fees and charges properly assessed against the Debtor's Estate under 28 U.S.C. § 1930.  For the avoidance of doubt, these Claims shall include Other Administrative Expense Claims and Professional Fee Claims.

"Allowed Claim" or "Allowed . . . Claim" means a Claim, proof of which is filed within the time fixed by the Bankruptcy Court, or that has been, or is hereafter, scheduled by the Debtor as liquidated in amount and not disputed or contingent, and to which no objection to allowance thereof has been raised by the Debtor within the applicable period fixed pursuant to the Plan, or as to which a Final Order allowing such Claim has been entered.

"<u>Avoidance Action</u>" shall mean causes of action against Persons arising under sections 502, 510, 541, 542, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced before or after the Effective Date to prosecute such Avoidance Actions.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Illinois, located in Chicago, Illinois, and any other court having jurisdiction over these Case or a proceeding arising in, or arising under or related to these Case.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as now in effect.

"<u>Board</u>" means the board of directors of the Debtor.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" as that term is defined in Bankruptcy Rule 9006(a).

"<u>Case</u>" means the case commenced under chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date.

"<u>Cash</u>" means legal tender of the United States of America and equivalents thereof.

"<u>Causes of Action</u>" means all claims and causes of action, including Avoidance Actions, of the Debtor as of the Effective Date, whether arising under any contract, the Bankruptcy Code, or other federal or state law, including, but not limited to, all litigation pending in any jurisdiction in which the Debtor are plaintiffs, defendants or other parties, and all other adversary proceedings and lawsuits, together with all products and proceeds thereof.

"<u>City of Chicago Case</u>" is the action is filed in the Circuit Court of Cook County with Case No. 2023 M1 401241 seeking to have the Property deemed distressed, to allow for a court appointed Receiver to sell the Property.

"<u>Claim</u>" means any right to payment, other than an Administrative Claim, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, as defined by section 101(5) of the Bankruptcy Code.

"<u>Class</u>" means a class of Holders of Claims as described in the Plan.

"<u>Class 1 Claims</u>" means Priority Claims.

"<u>Class 2 Claims</u>" means Secured Claims.

"<u>Class 3 Claims</u>" means non-priority unsecured Claims.

"<u>Class 4 Claims</u>" means Claims of Unit Owners for pro-rata equity interests in the Property.

"Confirmation Date" means the date of entry of the Confirmation Order.

"Confirmation Hearing" means the hearing of the Bankruptcy Court on the confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Creditors" means all Persons holding Claims against the Debtor.

"Debtor" means Ford City Condominium Association in the Case.

"Disbursement Assets" means the proceeds of Causes of Action, the Fees Payment, proceeds of accounts receivable, and cash assigned to the Liquidating Trust.

"Disbursing Agent" means the Trustee or, in the case of a Liquidating Trust, the Liquidating Trustee.

"Disputed Claim" means any Claim that is not an Allowed Claim or a claim the Debtor agrees should be allowed.

"Effective Date" means the date on which all the conditions to the effectiveness of the Plan as specified in Section 9.02 of the Plan have been satisfied or waived in accordance therewith.

"Equity Security" has the meaning as defined in section 101(16) of the Bankruptcy Code.

"Estate" means the estate of the Debtor created in this Case under section 541 of the Bankruptcy Code.

"Executory Contract" means a contract or lease to which the Debtor are a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"Fees Payment" is the payment for fees owed to the Debtor from the Unit Owners for assessments, special assessments and services related to the operation of the Property, which will be paid as part of the Receiver Sale.

"Final Order" means an order or judgment as to which the time to appeal or seek direct review or rehearing has expired and as to which no timely appeal or petition for review or rehearing is pending.

"Ford City Condominiums" means the seven condominium buildings operated by the Debtor pursuant to Illinois Condominium Property Act, 765 ILCS 605/1, et seq.

"General Unsecured Claim" means any Unsecured Claim, arising prior to the Petition Date, as applicable to each Debtor, that is not an Administrative Expense Claim, Class 1 Claim or Class 2 Claim.

"Holder" means an entity, Person, or governmental unit that owns a Claim or Interest.

"Impaired" means any Class, or any Claim in a Class, which is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Insider" has the meaning provided by section 101(31) of the Bankruptcy Code.

"Lapsed Distribution" means any distribution which has not been cleared or deducted from the Liquidating Trust's or the Debtor's bank account within ninety (90) days of the date of the distribution.

"Lien" has the meaning provided by section 101(37) of the Bankruptcy Code.

"Liquidating Trust" means the Trust established pursuant to Section 7.02 of this Plan.

"Liquidating Trustee" means the trustee appointed in the Liquidating Trust who will initially be William Avellone.

"Liquidation Analysis" means the analysis attached to the Plan as Exhibit 3.

"Other Administrative Expense Claim" means an Administrative Claim that is not a Professional Fee Claim.

"Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity.

"Petition Date" means April 20, 2021, which is the date that the Debtor filed its petition under Chapter 11 of the Bankruptcy Code.

"Plan" or "Subchapter V Plan" means the Debtor's Plan of Reorganization dated September 10, 2024 together with all exhibits, schedules, and annexes hereto, all as may be modified, supplemented, or amended from time to time.

"Plan Supplement" means the supplemental annex to the Plan, if any, consisting of a compilation of documents and forms of documents, schedules and exhibits to be filed with the Plan or on or before the Plan Supplement Filing Date.

"Plan Supplement Filing Date" means the date that is fourteen (14) days prior to the deadline set by the Bankruptcy Court to submit ballots to vote on the Plan.

"Post-Effective Date Debtor" means the Debtor in their post-Effective Date status.

"Priority Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means proportionately so that the ratio of the amount of the distribution made on account of a particular Allowed Claim to the distribution made on account of all Allowed Claims of the Class in which the particular Allowed Claim is included is the same as the ratio of

the amount a particular Allowed Claim to the total amount of the Allowed Claims of the Class of which a particular Allowed Claim is included.

"Professional Fee Claim" means a Claim of a Professional Person for compensation for services rendered in this Case prior to the Confirmation Date under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code for such Professional Person and the fees and expenses of the Subchapter V Trustee.

"Professional" or "Professional Persons" means Persons, including attorneys, accountants and financial advisors retained by the Debtor, or to be compensated under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code.

"Property Sale" means a Voluntary Sale or Receiver Sale of the Property.

"Receiver" means a receiver appointed by the court in the City of Chicago Case.

"Receiver Sale" means a sale ordered and effectuated by the Circuit Court of Cook County, Illinois in the City of Chicago Case.

"Schedules of Assets and Liabilities" means the Schedules of Assets and Liabilities and Statements of Financial Affairs filed by the Debtor in the Case and any amendments thereto.

"Secured Claim" means a Claim secured by a lien on property of the Estate, or a Claim subject to set off under section 553 of the Bankruptcy Code, to the extent of the value of such Creditor's Lien or security interest in property of the Estate, or to the extent of the amount subject to set off, as the case may be, which is either agreed to by the Debtor pursuant to this Plan or, in the absence of agreement, has been determined or is determined in accordance with Sections 506(a) and 502(b).

"Special Assessment" means one or more assessments which are being effectuated pursuant to Article 7 of this Plan.

"Subchapter V Trustee" or "Trustee" means William Avellone or any other Person subsequently appointed by the Bankruptcy Court to serve as trustee in possession of the Debtor pursuant to 11 U.S.C. §1104.

"U.S. Trustee" means the United States Trustee.

"Unit Owners" means the owners of the condominium units in the Ford City Condominiums.

"Unsecured Claim" means a Claim not secured by a Lien on property of the Estate, not entitled to be classified as a Priority Claim under section 507 of the Bankruptcy Code, and excludes the Insider Subordinated Claims and Intercompany Claims.

"Voluntary Sale" means a sale resulting from the voluntary deconversion of the condominium owners which is approved by the owners pursuant to the terms of the governing documents of the condominium association.

Section 1.05    Rules of Interpretation and Computation of Time.

For purposes of the Plan, unless otherwise provided herein:  (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (ii) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (iv) any reference to any entity as a holder of a Claim includes the entity's successors and assigns; (v) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (vi) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (viii) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (ix) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

Section 1.06    Exhibits.

All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein, regardless of when filed.  All references to "the Plan" shall be construed, where applicable, to include references to this document and all of its exhibits, appendices, schedules and annexes (and any amendments thereto made in accordance with the Bankruptcy Code).  To the extent that the description of any exhibit, appendix, schedule or annex, to the Plan is inconsistent with the actual terms or conditions of such exhibit, appendix, schedule or annex, the terms and conditions of the exhibit, appendix, schedule or annex, shall control.

## ARTICLE II

## UNCLASSIFIED CLAIMS

Section 2.01    Unclassified Claims.

In accordance with sections 1123(a)(1) and 1129(a)(9) of the Bankruptcy Code, Administrative Claims are not classified and are excluded from the Classes designated in Article III of the Plan.   Administrative Claims shall include Professional Fee Claims and Other Administrative Claims. The treatment accorded unclassified Claims is set forth in Article V of the Plan.  The holders of such Claims are not entitled to vote on the Plan.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

Section 3.01    Classified Claims.

Under section 1123(a)(1) of the Bankruptcy Code, Claims are classified as follows:

16

a.  Class 1 consists of all allowed claims entitled to priority under §507(a) and priority tax under §507(a)(8).

b.  Class 2 consists of the Secured Claims against the Debtor.

c.  Class 3 consists of the Allowed General Unsecured Claims against the Debtor.

d.  Class 4 consists of the Unit Owners within the condominium.

## ARTICLE IV

## VOTING AND IMPAIRMENT OF CLASSES

Section 4.01   Impaired Classes of Claims Entitled to Vote.

Under the Bankruptcy Code, only classes of claims and interests that are impaired under the plan are entitled to vote to accept or reject a plan. A class is impaired if the legal, equitable or contractual rights to which the holders of claims or interests are entitled are modified, other than by curing defaults and reinstating the debt. Pursuant to sections 1126(f) and (g) of the Bankruptcy Code, classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on a plan, and classes of claims and interests whose holders will receive or retain no property under the plan are deemed to have rejected a plan and are not entitled to vote on a plan. Creditors who hold disputed or disallowed claims are not entitled to vote to accept or reject the plan.

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept.  A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Except as otherwise ordered by the Bankruptcy Court, Class 1, Class 2 and Class 3, are Impaired, and the holders of Claims in those Classes are entitled to vote to accept or reject the Plan, except to the extent that such Creditor is an Insider.

Section 4.02   Classes Deemed to Accept the Plan.

None of the Classes are unimpaired and deemed to accept the Plan.

Section 4.03   Classes Deemed to Reject the Plan.

Not applicable.

Section 4.04   Voting and Confirmation Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s), by first class mail, hand or overnight courier, to:

Clerk of Bankruptcy Court
Everett McKinley Dirksen United States Courthouse
7th Floor
219 South Dearborn Street
Chicago, Illinois 60604

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON OCTOBER 9, 2024 (THE "VOTING DEADLINE").**

**ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN. ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE OR IS RETURNED BUT NOT EXECUTED WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Plan or the procedures for voting on the Plan, please email counsel for the Debtor, Scott R. Clar at sclar@cranesimon.com.

Section 4.05    Confirmation Hearing

A Confirmation Hearing is scheduled for October 16, 2024 at 2:00 p.m. CST before the Honorable Judge Deborah Thorne.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the objection deadline that has been set by the Bankruptcy Court.  Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

Section 4.06    Cram Down

The Debtor will request confirmation of the Plan under section 1191(b) of the Bankruptcy Code with respect to each Class that has not accepted the Plan.  In the event of a cram down under section 1191(b), the Disbursing Agent shall make payments to Creditors under the Plan and, notwithstanding section 1194(b), the Subchapter V Trustee shall have no duty to make payments to Creditors under the Plan.

Section 4.07    Fair and Equitable Test

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting class. In order for a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown" under the Bankruptcy Code, the Debtor must demonstrate that the plan provides that all of the projected disposable

18

income of the debtor to be received in the three-year period, or such longer period not to exceed five years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan and that:

    (A)(i)   The Debtor will be able to make all payments under the plan; or

       (ii)   There is reasonable likelihood that the Debtor will be able to make all payments under the plan; and

    (B) the plan provides for appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. In this case, the Debtor will be dissolved after the Voluntary Sale or Receiver Sale of the Property, so there will be no future business operations.

However, as part of the deconversion process, the Liquidating Trust will receive the Fees Payment owed to the Estate, which includes past due association fees owed by Unit Owners through the Effective Date, plus the Special Assessment, for which the Debtor has a statutory lien pursuant to 765 ILCS 605/9(g). The Debtor estimates that the Fees Payment will be approximately $2,350,000. The Fees Payment will be placed in the Liquidating Trust upon the closing of the Receiver Sale. Additionally, the Debtor will be holding approximately $20,000 in cash on the Effective Date, which will also be transferred to the Liquidating Trust on the Effective Date, along with the Causes of Action or proceeds thereof. The Debtor estimates that value of these Disbursement Assets will be approximately $2,350,000.

The Liquidating Trust will use the Disbursement Assets to make all payments due under the Plan and, due to the deconversion, the Plan will not result in a further reorganization.

Projections that support the Debtor's ability to make all payments required by the Plan are attached to the Plan as **Exhibit 2**. *See* 11 U.S.C. §1190.

The Debtor believes that the Plan meets the fair and equitable test, as the Debtor will make distributions under the Plan in excess of its projected disposable income over a three-year period following Plan confirmation. Additionally, the Plan provides for appropriate remedies in the event of a default in Section 7.13.

Administrative Claims will be paid upon the Effective Date from the Disbursement Assets, provided that, prior to the Receiver Sale, the Trustee shall have the right and the power to direct the Receiver to pay some or all of the Allowed Administrative Claims directly from the proceeds of the Receiver Sale if such action would minimize any expense to the Estate or the Liquidating Trust. If the proceeds of the Receiver Sale which are earmarked for the Debtor and its Estate in the City of Chicago Case will be sufficient to pay only the Allowed Administrative Claims and no

other creditors, the Trustee, in his sole discretion in the capacity as Disbursing Agent, may elect not to establish the Liquidating Trust.

The Debtor's projected disposable income is calculated on **Exhibit 2** to this Plan.

Section 4.08   <u>Best Interest Test</u>

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that holders of Impaired Claims and interests in each Impaired Class under the Plan would receive significantly less under a chapter 7 liquidation than under the Plan. This difference is represented in the Liquidation Analysis attached hereto as **Exhibit 3**.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtor's assets in a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the bankruptcy case and priority claims.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as that of counsel and other professionals retained by the trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is completed.

The Debtor believes that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtor believes that the members of each Impaired Class will receive significantly greater value under the Plan than they would in a chapter 7 liquidation proceeding. The Debtor's Liquidation Analysis demonstrates that in the event of liquidation as described therein, holders of Unsecured Claims would not receive a distribution on their Claims, barring recovery from Litigation Trust Claims, if any. To the extent that the Debtor determines that there are valuable Litigation Trust Claims, they will be passed directly on to the Creditors by way of a Litigation Trust, so they will receive the same or better value of the Litigation Trust Claims than they would receive in a chapter 7 case.  The Plan will provide a greater recovery than under chapter 7 due to: (i) the value the Debtor believes can be generated through the Debtor's future revenues which will fund distributions to Unsecured Creditors; and (ii) by avoiding the additional expenses associated with conversion to a chapter 7 case.

## ARTICLE V

## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

Section 5.01    Allowed Professional Fee Claims.

Allowed Professional Fee Claims, including the Allowed fees of the Subchapter V Trustee and his Professionals,  will be paid in full and in Cash from the Disbursement Assets in accordance with Section 7.04 on the later of:  (a) within ten (10) days of the closing of the Property Sale or (b) within ten (10) days of such Claims becoming Allowed, provided, however, that payment of an Allowed Professional Fee Claim may be made at a later date by agreement between the Subchapter V Trustee (or Liquidating Trustee) and the Professional.  The Debtor estimates that the Allowed Professional Fee Claims will total $900,000.  The allowance of Professional Fee Claims shall be the jurisdiction of the Bankruptcy Court, which will retain such jurisdiction after confirmation of the Plan.

Section 5.02    Allowed Other Administrative Expense Claims.

Allowed Other Administrative Expense Claims will be paid in full and in Cash from the Disbursement Assets in accordance with Section 7.04 on the latest of:  (i) within ten (10) days of the closing of the Receiver Sale; (ii) ten (10) days after such Claims become Allowed; (iii) the date upon which such Allowed Other Administrative Expense Claims become due in the ordinary course of business; and (iv) such other time as may be agreed in writing between the Debtor and the Holder of the Allowed Other Administrative Expense Claim.  Creditors seeking payment of Other Administrative Expense Claims have thirty (30) days following the occurrence of the Effective Date to file an application with the Bankruptcy Court requesting allowance and payment, or such Claims will be forever barred.  After the Effective Date, the Subchapter V Trustee (or Liquidating Trustee) may settle and pay any Allowed Other Administrative Claim in his reasonable discretion without any further notice, and without any action, order, or approval of the Bankruptcy Court.  The Debtor estimates that the Allowed Other Administrative Expense Claims will total $1,450,000.

Section 5.03    Payments to Classes and Timing

| Class | Impairment | Treatment |
|---|---|---|
| **Class 1-Priority Claims** | Impaired | No Priority Claims exist as of the filing of the Plan.  To the extent that any Priority Claims are filed and Allowed prior to the Unsecured Claims Bar Date, such Claims will receive a pro-rata distribution from the remaining Disbursement Assets, if any, after all Administrative Claims have been paid in full. |
| **Class 2- Secured Claims** | Impaired | Three Creditors have asserted Secured claims.  One is the City of Chicago which has asserted a secured claim in the amount of $563.58.  The City of Chicago has agreed to waive this Claim against the Estate. |

| | | Total Masonry, LLC and Parkway Elevators, Inc. have asserted claims which are allegedly secured by statutory mechanics liens on the Property. Since the Debtor does not own the Property, these claims are not secured by property of the Estate. The Subchapter V Trustee intends to object to these Claims. To the extent that they are Allowed against the Property, the liens shall continue in the Property and may be asserted against the proceeds of the Receiver Sale, but not against the Fees Payment or Disbursement Assets. To the extent that the claims of Total Masonry, LLC and Parkway Elevators, Inc. are not Allowed as Secured, they shall be treated as Class 3 Claims. |
|---|---|---|
| **Class 3- General Unsecured Claims** | Impaired | Non-priority Unsecured Claims will receive a pro-rata distribution of the remaining Disbursement Assets after all Administrative Claims, and Priority Claims are paid in full. Class 3 distributions, if any, will occur upon the later of (1) on or before 6 months after all Disbursement Assets are fully liquidated or (2) the date such Class 3 Claim is Allowed. The City of Chicago has agreed to waive its Class 3 Claims. |
| **Class 4-Unit Owner Claims** | Impaired | Claimants will receive a pro-rata distribution of the remaining Disbursement Assets (based on percentage value) after all Class 3 Claims have been paid in full. Class 4 distributions, if any, will occur upon the later of (1) on or before 6 months after all Disbursement Assets are fully liquidated or (2) the date such Class 4 Claim is Allowed. |

# ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

Section 6.01   Executory Contracts Assumed or Deemed Rejected.

Unless otherwise provided herein, all Executory Contracts of the Debtor that have not (a) expired by their own terms and (b) otherwise been assumed prior to the Effective Date or pursuant

to this Plan, will be deemed rejected under section 365 of the Bankruptcy Code on the Effective Date.

The Debtor may file a schedule of assumed contracts within ten (10) business days after the Effective Date as a supplement to the Plan. Debtor shall only be required to send notice of the filing of a schedule of assumed Executory Contracts to the counter-parties to such contracts. Parties in interest shall have ten (10) business days from the later of the date of filing of the schedule of assumed Executory Contracts or, in the case of counter parties to such contracts, the date of receipt of notice of the filing to object to the assumption of an Executory Contract (the "Assumption Deadline"). Such notice will be deemed to be received seven (7) days after the Debtor place such notice to a Person in the mail for delivery by the U.S. Postal Service. If no objections are filed on or before the Assumption Deadline, the contracts on the timely filed schedule of assumed contracts shall be deemed assumed. The amount necessary to cure any assumed contract shall be the amount listed in the schedule of assumed Executory Contracts, unless the counter-party to an assumed contract files a timely objection to the scheduled cure amount on or before the Assumption Deadline and the Court enters an order allowing a different cure amount.

Section 6.02    Bar Date for Rejection Damages.

All proofs of claim with respect to Claims arising from the rejection of Executory Contracts pursuant to Section 6.01 of the Plan must, unless the Bankruptcy Court has ordered otherwise, be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date. The Claims of any Person arising from the rejection of Executory Contracts or unexpired leases pursuant to Section 6.01 of the Plan that fails to timely file a proof of claim will be discharged under section 1141(d) of the Bankruptcy Code and forever barred from assertion against the Debtor or their assets.

## ARTICLE VII

## MEANS OF IMPLEMENTATION OF THE PLAN

The Plan will be effectuated as follows:

Section 7.01    Simultaneous Service of Subchapter V Trustee and Receiver.

Prior to a Receiver Sale (which will for all intents and purposes deconvert the condominium), the Subchapter V Trustee will collect outstanding assessments and prosecute the pending claims. A Receiver will be appointed by the Circuit Court of Cook County, Illinois in the City of Chicago Case for the limited purpose of running the sale process for the Receiver Sale of the Property. The scope of the Receiver's duties may be expanded by court order and upon agreement of the Subchapter V Trustee, but in the event that the scope of the Receiver's duties is expanded to include collecting outstanding assessments and managing the Property, any funds being held by the Subchapter V Trustee shall be used to pay the outstanding Allowed Administrative Claims in this Case and shall not be turned over to the Receiver. Nothing in this

paragraph shall prevent a Voluntary Sale, but likewise, the City of Chicago Case shall not be delayed or stalled to complete a Voluntary Sale.

Section 7.02   Property Sale and Liquidating Trust.

The Plan will be implemented pursuant to a sale of the Property to a third-party either through (1) the City of Chicago Case or (2) through a Voluntary Sale. Either sale would be on an "as is, where is" basis, without representations or warranties of any kind, nature or description. After the Receiver Sale or the Voluntary Sale: (a) the Property will no longer maintain its status as a condominium (the condominium association will be extinguished to the extent not already so); (b) the Property will no longer be operated as a condominium; (c) the Property shall be released from any condominium requirements or declaration; (d) any and all condominium plans relating to the Property shall be deemed permanently abandoned; (e) any and all existing liens on the Property or the residential units will attach to the proceeds of the sale of the Property, respectively, with the same priority, validity, force and effect as they now have against the Property or the residential units, respectively; provided, however, that the Liquidating Trustee, the Debtor and other parties in interest will retain the right to challenge any such liens. **To be clear, any lender with a lien or mortgage on a particular unit shall be limited to payment out of the proceeds attributable to that unit and not out of proceeds attributable to other units upon which the lender does not have a lien or mortgage.** The Debtor's interests in the proceeds of the Receiver Sale or Voluntary Sale which arise as a result of its liens related to the unpaid fees, dues, assessments, and special assessments will be automatically assigned to the Liquidating Trust which becomes effective upon the Effective Date, unless the Disbursement Agent arranges for creditors to be paid directly from the sale proceeds during the sale closing process. To the extent that creditors have not been paid at closing and funds flow to the Liquidating Trust, the Liquidating Trust will, in turn, make disbursements required by this Plan. The Liquidating Trust shall provide for payment of any administrative costs of the Liquidating Trust, including but not limited to professional fees, incidental expenses, postage, and taxes, if applicable, to be paid or reserved from the assets in the Liquidating Trust prior to any distribution to creditors.

Section 7.03   Special Assessment.

During this case, the Debtor has been operating at a negative budget and has not paid certain creditors who have provided valuable services to the Debtor's estate, including but not limited to plumbing professions and water provided by the Ford City Mall. The estimated amount of the Debtor's unpaid assessments is not sufficient to cover the costs of such claims, in addition to the other costs of this Case. The reason for the deficiency is the stagnant budget which had not been increased by the Board for many years and, as a result, the Debtor has not been assessing the Unit Owners fees for the actual cost to provide even the most basic maintenance and security of the Property. As a result, a special assessment is necessary.

Under Illinois law, the board of a condominium association may impose a special assessment under **735 ILCS 605/9, 735 ILCS 605/10 and 735 ILCS 605/18(a)(8)**. The Trustee was appointed to take possession of the Debtor and is authorized to operate the Debtor's business, in lieu of the Board, pursuant to Section 1108 of the Bankruptcy Code. Standing in the shoes of the Board, pursuant to this Plan, the Trustee has imposed a Special Assessment on the Unit Owners in the aggregate amount of $215,000 for the purpose of paying the expenses listed on Exhibit 4

24

hereto.  The Debtor has an inchoate lien in the amount of the first Special Assessment against any proceeds of a Receiver Sale or Voluntary Sale.  To the extent that the first Special Assessment is not sufficient to cover all projected expenses on Exhibit 4, a second Special Assessment will be effectuated as pursuant to this Plan.  In doing so, the Trustee will call a meeting an send out a bill for a second Special Assessment, which will become due and owing upon the date that a Receiver is appointed in the City of Chicago Case or such other date as provided in the notice (the "Special Assessment Due Date"), and the Debtor and its estate will have an inchoate lien effective immediately upon the Special Assessment Due Date.  To the extent that any Special Assessment remains unpaid by the Unit Owners on the closing of the Property Sale, it shall be paid from the proceeds of the sale.

The Special Assessment shall be in addition to any other unpaid fees, assessments fines or other charges owed to the Debtor by Unit Owners.

Section 7.04    Plan Payments.

As described further herein, the Plan generally provides for the payment of Allowed Claims from the proceeds of the Voluntary Sale or Receiver Sale.  The Debtor projects satisfaction in full of all Administrative Claims and, to the extent funds are available, payment of Allowed Priority Claims, if any, and Allowed General Unsecured Claims to be allocated pro rata among all such Claims.

Subject to approval in the Circuit Court of Cook County, Illinois in the City of Chicago Case, the sale proceeds remaining after (i) payment of all of the costs associated with the sale and Receiver fees and (ii) payment of all secured claims against the individual condominium units, the Estate will receive payment of all amounts due and owing to the Debtor by way of its statutory liens, including that obtained through the special or additional assessment process.  The sale proceeds will be held in escrow by the Title.

At closing of the Receiver Sale, the Title Company in consultation with the Trustee, for the benefit of the Estate, will establish a reserve in an amount sufficient to pay in full all of the accrued, but unpaid, fees and expenses of all Professionals retained as of closing (the "Professional Fee Reserve"). Upon entry of an order of this Court approving a Professional's fees and expenses, the Title Company will disburse funds to that Professional in accordance with the Court's order. The Profession Fee Reserve will be exclusively for the benefit of Professionals retained as of the Confirmation Date. To be clear, Professionals must obtain approval for payment of services provided and expenses incurred prior to the Effective Date, but do not have to obtain court approval for services provided and expenses incurred after the Effective Date.

At closing of the Receiver Sale or Voluntary Sale, the Title Company (or in the case of a Voluntary Sale, the closing agent or attorney if there is no Title Company) in consultation with the Trustee, for the benefit of the Estate, will establish a reserve in the amount of the proceeds of the Special Assessment (the "Special Assessment Reserve").  Upon entry of an order of this Court approving an Other Administrative Expense Claim, the Title Company will disburse funds to that

Holder of the Allowed Other Administrative Expense Claim from the Special Assessment Reserve in accordance with the Court's order.

The Title Company will transfer any unreserved funds allocated to the Estate to the Trustee who may use such funds to pay post-Effective Date fees and expenses. Then, after all Administrative Claims and post-confirmation fees and expenses have been paid, any remaining proceeds of the Receiver Sale and remaining funds in the Professional Fee Reserve and Special Assessment Reserve will be transferred to the Liquidating Trust for disbursement in accordance with this Plan.

Section 7.05    Transfer of Causes of Action.

All Causes of Action shall survive confirmation of this Plan and the commencement of prosecution of Causes of Action shall not be barred or limited by any res judicata or estoppel, whether judicial, equitable or otherwise, based upon confirmation of the Plan. The Debtor's rights to commence and prosecute Causes of Action are hereby assigned to the Liquidating Trust effective as of the Effective Date and shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

Section 7.06    Funding.

The Plan will be funded by the disposable income from the Debtor's business operations and the funds received from the sale of the Property through a Voluntary Sale or the Receiver Sale in the City of Chicago Case and any other Disbursement Assets which, unless Creditors and holders of Administrative Claims are paid directly at closing of a sale, will be transferred to the Liquidating Trust.

Section 7.07    Management.

The Subchapter V Trustee shall continue to manage the Debtor between the Confirmation Date and the Effective Date. The Debtor may elect new directors between the Confirmation Date and Effective Date. Since the Effective Date will occur upon the Receiver Sale, the association will dissolve simultaneously with this Plan becoming effective, but the Estate will continue to exist without the obligation of operating the Property. The Debtor's Board will cease to exist.

Section 7.08    Continued Corporate Existence Between the Confirmation Date and the Effective Date.

Between the Confirmation Date and the Effective Date, the Subchapter V Trustee shall continue in possession and control and continue to act in accordance with the Bankruptcy Code.

Section 7.09    Objections to Claims.

Each Claim shall be allowed or disallowed, as the case may be, in such amount as the Bankruptcy Court shall determine, whether prior to or following Confirmation, and whether pursuant to the Plan or otherwise, except that after the Effective Date, the Liquidating Trustee may settle or compromise any objections and/or controversies regarding Claims without notice or further order of the Bankruptcy Court. The deadline for the Trustee or Liquidating Trustee to file

26

all objections to Claims shall be no later than one-hundred and eighty (180) days after the Effective Date, which deadline may be extended by the Bankruptcy Court for good cause shown. The Trustee shall have non-exclusive standing to object to any Claim against the Debtor asserted by any party who is a defendant to the Causes of Action.

Section 7.10    No Distribution on Disputed Claims.

Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of Claims, no payment or distribution shall be made to the holder of any Disputed Claim until the time such Claim has been determined to be an Allowed Claim. Notwithstanding the existence of a Disputed Claim in a Class to which a distribution under this Plan is due, such distribution to other creditors shall not be affected by any delay in the resolution and/or allowance of the Disputed Claim. Upon the allowance of any Disputed Claim, the holder shall be paid the amount that such holder would have received had its Claim been an Allowed Claim on the Effective Date.

Section 7.11    Section 1146 Exemption.

Under, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument whatsoever in furtherance of or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, mortgage tax, real estate transfer tax, mortgage recording tax, filing or recording fee, or other similar tax or governmental assessments.

Section 7.12    Documentation Necessary to Release Liens.

Upon payment in full of the Secured Claims against the Debtor or its Estate[1], the secured claimants shall execute and deliver any documents necessary to release all Liens arising under any applicable security agreement or non-bankruptcy law (in recordable form if appropriate) in connection with its claims against the Debtor and such other documents as the Debtor may reasonably request.

Section 7.13    Appropriate Remedies.

In the event of a material default of the Debtor under the terms of the Plan due to insufficient funds received from the Property Sale, the Trustee will either amend the Plan, subject to Bankruptcy Court approval, or move to convert the case to Chapter 7.

Section 7.14    Disbursing Agent and Distribution Record Date.

Payments of the Holders of Administrative Claims will be made in accordance with the procedure laid out in the City of Chicago Case and Section 7.04 hereof. All other payments will be made by the Liquidating Trust as Disbursing Agent. The distribution record date shall be the close of business on Effective Date, at which time all transfer ledgers, transfer books, registers and any other records maintained by the Debtor or their agents with respect to ownership of any Claims

---

[1] The Secured Creditors of the Debtor and its estate are distinguished and separate from the secured creditors of the individual unit owners, which includes the Debtor via its liens against individual unit owners.

will be closed and, for purposes of the Plan, there shall be no further changes in the record holders of such Claims.

Section 7.15   Avoidance Actions

The Debtor believes that no viable or material avoidance actions exist.

Section 7.16   The Litigation Trust.

If a Liquidating Trust will be funded by the payment of any funds remaining from the proceeds of the Receiver Sale, after all payments are made in accordance with Section 7.04, plus any other Disbursement Assets. If no Disbursement Assets exist after the payments in accordance with Section 7.04, then the Subchapter V Trustee, in his sole discretion, may file a motion for final decree in this case in lieu of consummating the Liquidating Trust.

Section 7.17   Liquidating Trustee/Post-Confirmation Management

Continuing through the date that a final decree closing the Chapter 11 Cases is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Liquidating Trust shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Disbursement Assets.  In addition to the foregoing, for all matters arising in, arising under or related to the Chapter 11 Cases, the Liquidating Trust shall: (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction; (ii) have the right to obtain records of, or related to, the Debtor (including, without limitation, bank statements and cancelled checks); (iii) be entitled to notice and opportunity for hearing; (iv) be entitled to participate in all matters brought before the Bankruptcy Court, including, but not limited to, adversary proceedings related to the Causes of Action; (v) have exclusive standing (including derivative standing) to pursue Causes of Action on behalf of the Debtor; (vi) be entitled to request the Bankruptcy Court to enter a final decree closing the Chapter 11 Cases; and (vii) receive notice of all applications, motions and other papers and pleadings set before the Bankruptcy Court in these Chapter 11 Cases.

## ARTICLE VIII

## BAR DATES FOR ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS AND GENERAL UNSECURED CLAIMS

Section 8.01   Bar Date for Administrative Claims.

Notwithstanding anything to the contrary or alternative provided by prior orders of the Bankruptcy Court regarding allowance or payment of Professional Fee Claims, all Persons requesting payment of any Administrative Claim, including but not limited to Professional Fee Claims, and Other Administrative Claims, must file applications for payment no later than thirty (30) days after the Effective Date. Any Administrative Claims for which applications are not timely filed in accordance herewith will be deemed discharged and barred from being asserted against the Debtor; *provided that* previously approved or Allowed applications for Administrative Claims do not need to be re-filed.

28

Section 8.02    Bar Date for Priority and General Unsecured Claims.

All Priority Claims and General Unsecured Claims must be filed with the Bankruptcy Court within sixty (60) days of the date the Bankruptcy Court enters a Confirmation Order (the "Unsecured Claims Bar Date").  The Subchapter V Trustee shall place in U.S. mail notice of the Unsecured Claims Bar Date to all Creditors within ten (10) days of the date the Bankruptcy Court enters a Confirmation Order.  Any Priority or General Unsecured Claims which are not timely filed on or before the Unsecured Claims Bar Date will be deemed discharged and barred from being asserted against the Debtor, its Estate, or the Liquidating Trust

## ARTICLE IX

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

Section 9.01    Conditions to Confirmation.

The Plan shall not be confirmed unless and until the following conditions have occurred or have been waived in writing by the Debtor:

    a.   The Court approves this Plan and the disclosures contained herein and does not order the Debtor under section 1181(b) of the Bankruptcy Code that section 1125 of the Bankruptcy Code applies; and

    b.   The Court enters the Confirmation Order in form and substance acceptable to the Debtor.

Section 9.02    Conditions to Effective Date.

The Effective Date shall occur only if either of (a) or (b) below occur, unless waived in writing by the Trustee:

    a.    All of the following events occur:

        1.   The court in the City of Chicago Case enters an order:

            a.   Appointing a Receiver with the authority to sell the Property;

            b.   Approving the sale of the Property;

            c.   Ordering that:

                i.   the Property is no longer condominiums;

                ii.  the Property shall be deemed to be owned in common by the Unit  Owners;

                iii. the undivided interest in the Property which shall appertain to each Unit Owner shall be the percentage of

undivided interest previously owned by the Unit Owner in the common elements; and

    iv. Any liens affecting any unit shall be deemed to attach to the undivided interest of the Unit Owner in the Property;

    d. Approving the statutory liens of the Debtor against the condominium units for unpaid assessments from the sale proceeds in an amount not less than the Administrative Claims;

    e. Requiring the Fees Payment to the Debtor to be made from the proceeds of the Receiver Sale to satisfy the Debtor's statutory liens;

2. The Receiver Sale closes;

3. The Confirmation Order has been entered and has not been vacated, reversed, stayed, enjoined or restrained by order of a court of competent jurisdiction; and

4. The deadline for an appeal of the Confirmation Order has lapsed.

  b. All of the following events occur:[2]

1. The Unit Owners approve a Voluntary Sale, the proceeds of which would be sufficient to make the Fees Payment in an amount not less than the Administrative Claims;

2. The Administrative Claims are paid in full at the closing of a Voluntary Sale from the proceeds of the sale, in satisfaction of the Debtor's statutory liens against the condominium units for unpaid assessments;

3. The Voluntary Sale closes;

4. The Confirmation Order has been entered and has not been vacated, reversed, stayed, enjoined or restrained by order of a court of competent jurisdiction; and

5. The deadline for an appeal of the Confirmation Order has lapsed.

---

[2] Nothing in this Plan, including the option for a Voluntary Sale, shall be used as a cause to delay the appointment of a Receiver or a Receiver Sale, as time is of the essence and delay will likely result in higher costs of operations and expenses and, in turn, less recovery to Unit Owners.

## ARTICLE X

## EFFECTS OF CONFIRMATION

Section 10.01  <u>Debtor's Discharge.</u>

Pursuant to section 1192 of the Bankruptcy Code, effective upon the completion of payments in the Distribution Schedule, the Plan will discharge the Debtor from any and all Claims including any Claim, demands, Liens, and Interests that arose from any agreement of the Debtor entered into, or obligations of the Debtor incurred before the Effective Date, or from any conduct of the Debtor prior to the Effective Date or that otherwise arose prior to the Effective Date, including, without limitation, all interest, if any, on such debts, whether such interest accrued before or after the Petition Dates of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was Filed or deemed Filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of Assets and Liabilities of the Debtor, (ii) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (iii) such the Holder of the Claim has voted on or accepted the Plan.

Section 10.02  <u>Injunction.</u>

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE CONFIRMATION DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTOR ARE, WITH RESPECT TO OR ON ACCOUNT OF ANY SUCH LIENS, CLAIMS OR INTERESTS, PERMANENTLY ENJOINED FROM:      (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTOR, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (II) ENFORCING AGAINST, LEVYING UPON OR ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT) THE DEBTOR, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (III) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, CLAIM OR ORDER AGAINST THE DEBTOR, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (IV) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIENS, CLAIMS OR INTERESTS OF ANY KIND AGAINST OR IN THE DEBTOR, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (V) OTHER THAN AS

OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, ASSERTING ANY RIGHT OF SETOFF, SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR, OR ANY OF THEIR RESPECTIVE PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; AND (VI) TAKING ANY ACTIONS IN ANY PLACE AND IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN.

Section 10.03   Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in these Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect through the imposition of the injunction set forth in Section 10.02 of the Plan.

Section 10.04   Exculpation.

The Debtor nor any of their members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity, will have or incur any liability to, or be subject to any right of action by, any Person or entity, for any act or omission in connection with, relating to or arising out of, the Case or the pursuit of confirmation of the Plan, except to the extent arising out of fraud, willful misconduct or gross negligence, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Section 10.05   Other Documents and Actions.

The Debtor, the Subchapter V Trustee, and the Liquidating Trustee are authorized to execute such documents and take such other action as is necessary to effectuate the transactions contemplated by the Plan.

Section 10.06   Powers of Circuit Court of Cook County.

The City of Chicago and the Circuit Court of Cook County are authorized to take all actions necessary, and to request and enter without delay, any orders or judgments required to effectuate the deconversion and sale of the Property as requested by the City in the City of Chicago Case, case no. 2023-M1-401241, currently pending before the Hon. Leonard Murray.  This Plan does not stay or delay that action and, in fact, is dependent upon a Property Sale moving forward in an expeditious manner.

Section 10.07   Powers of Unit Owners

If a Receiver Sale has not yet occurred, the unit owners may approve a Voluntary Sale, provided that such Voluntary Sale is in compliance with the governing documents of the association and the law.  Neither a Receiver, the court nor the City of Chicago have any obligation

to wait for a Voluntary Sale before moving forward with the Receiver Sale, due to the deterioration of the Property.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.01  Headings for Convenience Only.

The headings in the Plan are for convenience of reference and will not limit or otherwise affect the meanings thereof.

Section 11.02  Binding Effect of Plan.

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtor, the Estate, and any holder of a Claim treated herein or any entity named or referred to in the Plan and each of their respective representatives, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

Section 11.03  Modification of the Plan.

The Debtor may alter, amend or modify the Plan and related documents under section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Effective Date.  After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtor may, so long as the treatment of holders of Claims are not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan.

Section 11.04  Final Order.

Except as otherwise expressly provided in the Plan, the Debtor may waive any requirement in the Plan for a Final Order.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

Section 11.05  Severability.

Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim, such provision shall be unenforceable as to all holders of Claims to the specific holder of the Claim as to which the provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.  The Debtor reserves the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.

Section 11.06  <u>Governing Law.</u>

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF ILLINOIS OR THE UNITED STATES OF AMERICA.

Section 11.07  <u>Notices.</u>

Any notice required or permitted to be provided under this Plan shall be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; (iii) electronic mail; or (iv) reputable overnight delivery service, freight prepaid, with copies to the following parties and others, if any, set forth in the Plan Supplement:

If to the Debtor:

Ford City Condominium Association
c/o:     CRANE, SIMON, CLAR & GOODMAN
Scott R. Clar
135 S. LaSalle Street
Suite 3950
Chicago, Illinois 60603
(312) 641-6777
sclar@cranesimon.com

and

To the United States Trustee ("UST"):
Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov
Office of The United States Trustee
219 S. Dearborn Street
Room 873
Chicago, IL 60604

If to the Subchapter V Trustee:

William B. Avellone
Subchapter V Trustee
Chartered Management Company
100 S. Saunders Rd., Suite 150

Lake Forest, IL 60045
Tel: 312-273-4004
bill.avellone@charteredmgt.com

and

Shelly A. DeRousse, Esq.
Adam C. Toosley, Esq.
Smith Gambrell and Russell LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone:  (312) 360-6000
E-mail:  sderousse@sgrlaw.com
        atoosley@sgrlaw.com

Section 11.08  <u>Filing of Additional Documents.</u>

To the extent not filed with the Plan, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Section 11.09  <u>Lapsed Distributions.</u>

Lapsed Distributions will revert to the Liquidating Trust and be distributed *pro rata* in accordance with the priorities of the Plan.

Section 11.10  <u>Undeliverable and Unclaimed Distributions.</u>

If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder of an Allowed Claim will be made unless the Liquidating Trustee is notified in writing of the Holder's current address within thirty (30) days after the distribution date. Upon receipt of the notification, the Liquidating Trustee will remit the distribution to the Holder of the Allowed Claim without interest.  All claims for undeliverable distributions or notice of address must be made within thirty (30) days after the distribution date or else the distribution will be deemed to be a Lapsed Distribution.  Nothing in the Plan will require the Debtor or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.  For any distribution which becomes a Lapsed Distribution, the Liquidating Trustee shall be deemed to have made such distribution for the purpose of satisfying the amount required under this Plan of Fees Payment or any other contribution requirement.

Section 11.11  <u>Defenses with Respect to Claims.</u>

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtor, with respect to any Claim, including but not limited to all rights in respect of legal and equitable defenses to setoffs or recoupments against such Claims.

Section 11.12  <u>No Injunctive Relief.</u>

No Claim shall under any circumstances be entitled to specific performance or other injunctive, equitable or prospective relief.

Section 11.13  <u>No Admissions.</u>

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtor with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of any classification of any Claim.

Section 11.14  <u>Written Agreement.</u>

Any provision of this Plan which requires written agreement may be satisfied by email or other electronic communication indicating agreement of the relevant party.

Section 11.15  <u>Minimal Distribution.</u>

If any Pro-Rata distribution to a holder of an Allowed Claim under this Plan would be in an amount less than $50.00, the Liquidating Trustee is not required to make such distribution and for the purposes of satisfying the amount required under this Plan of Fees Payment, the distributions shall be treated as having been made.

## ARTICLE XII

## RETENTION OF JURISDICTION

Section 12.01  <u>Exclusive Jurisdiction of Bankruptcy Court.</u>

The Bankruptcy Court will retain jurisdiction over these Cases for the following purposes:

(a)    Resolution of any and all objections to Claims.

(b)    Unless otherwise determined by a court of competent jurisdiction, determination of all questions and disputes regarding all Causes of Action, controversies, disputes or conflicts, whether or not subject to pending actions as of the Confirmation Date, between: (i) the Debtor and any other Person relating to any Claim or any term of the Plan or any transaction or act occurring under or pursuant to the Plan; or (ii) otherwise under the Plan, the Confirmation Order or any other order issued by the Bankruptcy Court in connection with these Cases.

(c)    The correction of any defect and the curing of any omission or inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan.

(d)    Modification of the Plan after the Confirmation Date pursuant to the Bankruptcy Code and the Bankruptcy Rules.

(e)     Allowance of all Claims and applications for payment of Administrative Claims and Professional Fee Claims, and Professional's expenses which may be paid by the Debtor pursuant to the provisions of the Plan and the Bankruptcy Code and resolution of all disputes pertaining thereto.

(g)     Determination of all questions and disputes regarding or relating to any loans to the Debtor approved by the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code.

(h)     Enforcement of any order entered by the Bankruptcy Court.

(i)     Entry of a final order confirming substantial consummation of the Plan and closing the Cases.

Dated:  September 10, 2024          FORD CITY CONDOMINIUM ASSOCIATION


By: /s/ *Scott R. Clar*
      One of Its Attorneys

**CRANE, SIMON, CLAR & GOODMAN**
Scott R. Clar
135 S. LaSalle Street
Suite 3950
Chicago, Illinois 60603
(312) 641-6777
sclar@cranesimon.com

***Counsel for the Debtor***


***With Support of:***

**William B. Avellone, as Subchapter V Trustee in Possession**

**SMITH, GAMBRELL & RUSSELL LLP**
Shelly A. DeRousse
Adam C. Toosley
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312)360-6000
sderousse@sgrlaw.com
atoosley@sgrlaw.com
***Counsel for William B. Avellone, as Subchapter V Trustee in Possession***

**Exhibit 1**

**Initial Potential Offers From Investors[3]**

|  | Total Price | Avg. Price Per Unit[4] | Earnest Money Deposit | Due Diligence | Closing Timing | Contingencies |
|---|---|---|---|---|---|---|
| **Bidder 1** | $14,476,100 | $45,380 | $500,000 | 180 Days | 120 Days after Due Diligence | Financing, City of Chicago agreed relocation and redevelopment plan |
| **Bidder 2** | $11,216,000 | $35,050 | $50,000 initial, and additional $100k upon approvals and completion of Due Diligence | 60 Days physical due diligence | Unknown based on contingencies, likely ~120 days | Buyer being approved for HUD 221(d) financing, Buyer qualifying for a tax exempt bond from City of Chicago & Illinois Housing Development Authority, Ford City Member approval. |
| **Bidder 3** | $16,000,000 | $50,157 | $250,000 initial, and additional $250k upon approvals and completion of Due Diligence | 45 Days | 30 Days or mutually agreed on date | No financing contingency, but will be financing the property |
| **Bidder 4** | $16,000,000 | $50,157 | $100,000 initial deposit | 180 Days | 30 Days or mutually agreed upon date | Financing contingency. Buyer approval of a preliminary title report for all 319 Units obtained at Seller's expense. |
| **Bidder 5** | $15,000,000 | $47,022 | $200,000 initial deposit | 90 Days | 30 Days or mutually agreed upon date | Financing contingency. Buyer approval of a preliminary title report for all 319 Units obtained at Seller's expense. |

---

[3] Based on Letters of Intent ("LOI") received by Trustee. All of the LOI have expired, but bids will be resolicited after deconversion is approved or at another appropriate time.
[4] Would vary based on size of unit.

**Exhibit 2**

**Financial Projections**

| | |
|---|---|
| Cash On Hand | $20,000 |
| Proceeds of Ordinary Monthly Assessments Due at Sale of Property | $2,115,000 |
| Proceeds of Special Assessments Due at Sale of Property | $215,000 |
| **Total Available for Disbursement:** | **$2,350,000** |
| | |

Exhibit 3

Liquidation Analysis

**Ford City Condominium Association**

**LIQUIDIATION ANALYSIS
(Actual $s)**

| Ford City Condominium Association Assets | Gross Book Value of Assets | Chapter 7 Liquidation Lower |
|---|---|---|
| Accounts Receivable | $2,243,200 | $897,280* |
| Furniture and Equipment | $0 | $0** |
| **TOTAL LIQUIDATION VALUE OF ASSETS*** | | **$897,280** |
| less: Liquidation Cost (40% Collection Fees) | | ($89,728) |
| Post-petition Accounts Payable | | ($1,198,275) |
| Cash on Hand at Distribution Date | | $20,000 |
| **NET CASH AVAILABLE FOR DISTRIBUTION** | | **-$370,723** |
| Chapter 7 Administrative Expenses | | ($100,000) |
| Chapter 7 Trustee Fees | | ($60,000) |
| Chapter 11 Administrative Expenses | | ($650,000)**** |
| **Available to Pre-Petition Creditors** | | **$0** |
| Pre-Petition Claims | | $5,349,793 |
| **Recovery of Pre-Petition Claims** | | **$0** |

*Assumes that if converted to a Chapter 7, the Property will be condemned and minimal value will be received from the sale of units or land in the case of demolition.

**Liquidation expense exceeds value.

***Analysis excludes claims against insurance carrier which were dismissed and are on appeal.  Unknown value, so no value is attributable to this item.

****Excludes additional costs of Property Sale because analysis assumes condemnation.

**Exhibit 4**

**Special Assessment Expenses**

Ford City Mall Water Post-Petition Accrued Charges:  $200,000.00

Elevator Repair Charges Incurred Post-Petition:   $15,000.00